[Cite as *Shanklin v. Lowman*, 2011-Ohio-255.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

BERNICE R. SHANKLIN, ET AL.,        CASE NO. 8-10-07

   PLAINTIFFS-APPELLEES,

  v.

STURGILL LOWMAN, DBA LOWMAN
LUMBER COMPANY,

   DEFENDANT-APPELLANT,        O P I N I O N

  and

LOWMAN LOGGING INC., ET AL.,

   DEFENDANTS-APPELLEES.

Appeal from Logan County Common Pleas Court
Civil Division
Trial Court No. CR 08 10 0529

Judgment Affirmed

Date of Decision:  January 24, 2011

APPEARANCES:

   *Ronald C. Tompkins,* for Appellant

Case No. 8-10-07

*John D. Bodin,* **for Appellees Bernice R. Shanklin and Thomas Stacy**

**ROGERS, P.J.**

{¶1} Defendant-Appellant, Sturgil Lowman dba Lowman Lumber Company, appeals the judgment of the Court of Common Pleas of Logan County finding in favor of Plaintiff-Appellees, Bernice R. Shanklin, individually and in her capacity as the trustee of the Charles E. Shanklin Trust, and Thomas Stacy (hereinafter collectively referred to as "Appellees"), and awarding Appellees $135,000 in trebled compensatory damages, $33,500 in punitive damages, and $35,638.50 in attorney's fees. On appeal, Sturgil Lowman argues that the trial court erred by permitting Stacy, an agent, to act as a plaintiff; by failing to require that Stacy's agency contract be disclosed to the jury; by allowing testimony regarding the cost of recovery despite any credible evidence of the costs to repair the real estate; and, by admitting evidence of prior acts that were prejudicial to Lowman. Additionally, Lowman contends that the jury's finding that Lowman was reckless was against the manifest weight of the evidence. Finally, Lowman contends that the award of punitive damages in addition to treble damages was inappropriate because Appellees failed to prove malice by clear and convincing evidence. Based upon the following, we affirm the judgment of the trial court.

-2-

{¶2} In October 2008, Bernice Shanklin and Thomas Stacy filed a complaint against Lowman Logging, Inc., Lowman Lumber Company, Sturgil Lowman (hereinafter collectively referred to as "Lowman"), and Dale Kauffman, alleging that Shanklin was the owner of real property located along County Road 10 in Logan County, Ohio, known as Parcel Number 12-110-00-00-001-000 (hereinafter referred to as "the Shanklin property"); that Stacy was the authorized forest steward of the Shanklin property; that Kauffman was the trustee of real property located along County Road 2 in Logan County, Ohio, known as Parcel Number 12-095-00-00-036-000 (hereinafter referred to as "the Kauffman property"); that the Shanklin property and Kauffman property were adjacent to each other; that, in or about March 2005, Lowman entered the Kauffman property for the purpose of cutting down and removing trees, presumably pursuant to a contract or agreement executed by Lowman and Kauffman; that, at some point, Lowman trespassed onto the Shanklin property, cut down numerous trees, and removed the lumber; and, that Lowman's actions on the Shanklin property were unauthorized and were not preceded with any notice or warning. Based on the preceding, Appellees alleged against Lowman (1) Count One, violation of R.C. 901.51, resulting in damages to Shanklin in excess of $25,000, with triple damages pursuant to the statute; (2) Count Two, conversion, resulting in damages to Shanklin in excess of $25,000 for the converted lumber; (3) Count Three, trespass,

resulting in damages in excess of $25,000; (4) Count Four, intentional destruction of real property, resulting in damages in excess of $25,000; (5) Count Five, negligent destruction of real property, resulting in damages in excess of $25,000; and, (6) Count Six, unjust enrichment in an amount in excess of $25,000. As relief, Appellees sought damages in excess of $100,000, triple money damages pursuant to R.C. 905.51, pre and post-judgment interest, punitive damages of $200,000, costs, and reasonable attorney's fees.

{¶3}  In May 2009, Sturgil Lowman was deposed and stated that he owned Lowman Lumber Company; that Lowman was not an actual corporation, but just the name of the business; that he had been doing business as Lowman Lumber Company for approximately twenty-five years; that he had never formed any entities, corporations, or limited liability companies; that his business cut lumber, hauled lumber to his sawmill, cut the lumber, and sold the lumber; that he employed about twenty full-time employees at Lowman; that he never owned any interest in Lowman Logging, Inc.; that he had previously also done business as Lowmont Veneer, which purchased veneer logs; and, that Lowmont Veneer was a corporation for which he was a partner with Todd Montgomery.

{¶4}  Lowman continued that, before the incident involving the Shanklin property, he had agreed to purchase timber from Dale Kauffman, the adjoining landowner; that Kauffman had shown him the corners of the property by walking

with him or driving him to the corners of the property; that he never hired a surveyor to confirm the property lines; that he never consulted any maps or real estate records to determine the property lines, but had his employee, Ken Nisley, "mark the lines with ribbons" (Lowman dep., p. 25); that his employees began cutting on the Kauffman property several days later, and he was present during part of the time; that he believed he paid Kauffman more money than they had agreed upon because he cut more timber than he thought he would have; that neither he nor his employees kept any documentation about how many trees or what types of trees were cut; that, approximately one year after cutting trees pursuant to his agreement with Kauffman, Stacy called Kauffman and informed him that Lowman had cut twenty-five acres across the property line; that he and Kauffman walked the line and did not see a fence; that there were survey flags and stakes along the Kauffman property line, and he did not dispute that there was cutting that occurred beyond that marked line; that he and Kauffman met with Kevin Bruce, a surveyor, regarding the line, but that Bruce did not call him back and he did not believe Bruce actually surveyed the property; that he acknowledged and admitted that he cut beyond the property line; that his employees had cut a fence on the Shanklin property; and, that he believed there were some veneer logs removed from the area his company cut, whether from the Kauffman or Shanklin properties.

**{¶5}** Lowman continued that his company had previously gone across a property line and removed trees without permission from a McLaughlin property; that he did not dispute that he cut the McLaughlin trees without permission; that he paid for that incident, but did not recall what amount; that his company had also gone across a property line and removed trees without permission from a Kelly property; that he paid for that incident; that his company had also removed timber from an Estep/Muex property; and, that he was convicted of the felony of receiving stolen property for the Estep/Muex incident and was paying restitution and serving a community control sentence.

**{¶6}** Thereafter, Appellees voluntarily dismissed Lowman Logging, Inc., without prejudice.

**{¶7}** In January 2010, Lowman filed a motion to join as a necessary party the person holding the present ownership of the undivided one-half interest in the Shanklin Property, previously held by Charles E. Shanklin, the deceased spouse of Bernice Shanklin. Shortly thereafter, the trial court granted the motion, joining Bernice Shanklin in her capacity as trustee for the estate of Charles E. Shanklin.

**{¶8}** In April 2010, the trial court filed an entry reflecting that "Plaintiffs and Defendants agree that all the parties who have or could claim a legal interest in the subject real estate are now joined as Plaintiffs herein." (Apr. 2010 Judgment Entry, p. 1).

{¶9} In May 2010, Appellees voluntarily dismissed Kauffman without prejudice. Thereafter, the case proceeded to jury trial, at which the following testimony was heard.

{¶10} Thomas Stacy testified that he resided in Zanesfield, Ohio; that his property was across the road from the Shanklin property; that he had known the Shanklin family for approximately nineteen years and had agreed to "maintain the trails" and "look after" the Shanklin property as its "forest steward"; that, specifically, he maintained the health of the trees by removing invasive vines, removed trees that had fallen on other trees, ensured there was no hunting on the property, and kept the trails open and mowed so the Shanklin family could use them during visits; that the Shanklins did not want any motorized traffic on the property except as required for maintenance; that the trails he referred to were walking trails; and, that he was not monetarily compensated for his work by the Shanklins, but that he and his family were allowed to be on the Shanklin property.

{¶11} Stacy continued in describing the "old growth area" of the Shanklin property, testifying that there were multiple aspects of the property contributing to its uniqueness (trial tr., p. 56); that the canopy was very high, completely shading the area when leaves were present; that the tree trunks were very tall and straight; that the area had "the most lush undergrowth" he had seen anywhere in Ohio (id.); that the east edge of the back parcel had a dramatic, deep, narrow ravine that was

approximately forty or fifty feet deep; and, that the wildlife was very rich and included coyotes, foxes, and deer. Stacy testified that this particular old growth area was located approximately one half mile from his residence across the road.

{¶12} Stacy further testified that, in early 2005, a man who identified himself as Larry Green on behalf of Lowman Lumber came to his house; that the man told him that the company he worked for was working on other properties in the area and inquired as to whether he knew who owned the Shanklin property; that he informed the man that he knew the owners and also took care of the land; that the man requested he ask the owners if they were interested in harvesting the timber and asked to walk through the property; that he took the man through part of the front parcel, and the man stated it would be valuable to harvest timber from the property and offered him $10,000 if he could convince the owners to let his company harvest the timber; that he immediately declined the offer and told him that, if the Shanklins were interested, they would contact him; that he gave absolutely no indication that the Shanklins were willing to sell timber to Lowman; and, that he did not believe, based on his discussions with the Shanklins, that they ever wanted to sell timber from the property.

{¶13} Stacy continued that, in approximately March or April 2006, he began cleaning up the Shanklin property due to an ice storm that had occurred; that he was traversing the property with his daughter to show her the ravine and

waterfalls in the old growth area when he discovered a road and bulldozer tracks; that he was alarmed and began following the road and began to see stumps; that approximately twelve to fifteen acres of the property had become a field or "clear cut area" except for some stumps, roads, and paths (id. at 66); that a logging road had been cut nearly a quarter of a mile into the property from the neighboring Kauffman property line; that he discovered two points of entry into the Shanklin property with approximately twenty branches off the main entry road; that there was a fence marking the property line between the Shanklin property and the Kauffman property; that the main logging road went through the fence line, and the fence had been cut off and rolled up; that, in addition to the removal of trees, there was extensive damage to trees that were not taken, including scars and "chunks" resulting from equipment being moved through the area; that there were also tops of trees that had been left on the ground after the trunks were removed; that a tree creates a ring for every year of growth; that he counted the rings on numerous stumps, and there were 115 rings at the most; and, that he believed it would cost approximately $15,000 to $20,000 to remove the stumps and tree tops to turn the area into a field.

{¶14} Stacy continued that he alerted the Shanklins as to the destruction and recommended they have the area surveyed and examined by a forester, Paul Clapsaddle; that, because the Shanklins lived in Florida, were elderly, and were

coping with a family illness, they reached an agreement under which he would pursue the matter on their behalf; and, that, as of the trial date, they had not paid him anything.

{¶15} On cross-examination, Stacy testified that he had no formal training in forestry; that the Shanklin family moved out of the area in 1994 or 1995; that he could not recall the last time a member of the Shanklin family was on the property prior to summer 2005; that he did not have any photographs showing the fence; that the front part of the property had suffered extensive damage due to an ice storm because the trees in that area were thinner and younger, and did not have a tight canopy; that there was minimal damage to the back part of the property due to the heavy canopy created by the trees being closer together; that there was old fencing inside of the property line; that he had an understanding with the Shanklins that he would be paid for his time which "might have been in terms of a percentage" (id. at 118), and there was a "little discussion" about the matter (id. at 117); that he was not sure if the agreement was in writing; and, that he did not write an agreement, but that the deceased Mr. Shanklin or the Shanklins' trial counsel may have.

{¶16} James L. Bartlett testified that he was a consulting forester certified by the Society of American Foresters; that, in late March 2007, Stacy hired him for consulting work on behalf of the Shanklins; that Stacy required he give a

stump count, identify species, estimate the volume of the trees that were cut from examining the remaining stumps, and estimate the value of the trees at the time they were cut; that he spent approximately six hours finding and measuring stumps on the Shanklin property; that he viewed the property line between the Shanklin and Kauffman properties; that he did not see an old fence; that "just about everything of value was cut" (id. at 128); that the only remaining trees were hollow, crooked, or damaged; that there were very few trees left; that there were logging roads put in with a bulldozer cut down to mineral soil; that he counted and measured the remaining stumps, as well as identified the species; that he counted 282 stumps at a minimum, because more stumps may have been located under the tree tops left on the property or inside the ravines; that he used a formula developed by the United States Forest Service and the diameter measurement of the stumps to determine the "board feet" of the trees; that the trees ranged in age from about 60 to 150 years; that he determined the value of the trees by using the timber price information sheets issued by the Division of Forestry from Fall 2005 and January 2006, or the time the trees were cut; that, based on the number of trees, species, board feet, and timber price, he estimated the aggregate value of the trees at $30,671; that his calculation took into consideration an estimated 1,500 board feet of walnut veneer, the highest quality log within a tree, but that there could have been more board feet of veneer; that it was possible, due to competitive

bidding, that the Shanklins could have sold the timber for more than the minimum value of $30,671; that, in some competitive bidding situations, the high bid could be double the low bid; that he could not put a value on the "loss of beauty" to the property or the loss of enjoyment of the property (id. at 139); that he had prior experience with Lowman being involved in trespass-related logging incidents; and, that he estimated twelve to fifteen acres of the back 53 acres of the Shanklin property had been cut.

{¶17} On cross-examination, Bartlett testified that his visit to estimate damage in late March 2007 was his first trip to the property; that the largest diameter of the trees on the Shanklin property that he observed was about three feet; that, in 2005, following an ice storm in January, many trees in the county were cut to salvage some of the timber damaged in the storm; that he did not view the Shanklin property prior to or immediately after the storm; that he had viewed an adjacent property, Kirkmont Church Camp, which had suffered some damage from the storm; that, from these observations, he concluded that at least some damage would have occurred to the Shanklin property; and, that it was possible someone may have bid lower for the board footage than his estimation, given that there could have been damage as a result of the ice storm.

{¶18} William Kevin Bruce testified that he was a professional registered surveyor; that Kauffman and Lowman requested he visit the Shanklin and

Kauffman properties in May 2007; that he identified the property line and observed that cutting had taken place across the line on the Shanklin property; that he believed it "seemed very straightforward to [him] where the property line was" (id. at 170); that the cutting extended five or six hundred feet across the property line, and that he visually estimated this was eight to ten acres; and, that, had Lowman hired a surveyor prior to the cutting, the line between the Kauffman and Shanklin properties would have easily been determined.

{¶19} On cross-examination, Bruce testified that property lines in Logan County were defined by the Virginia Military Survey; that, prior to viewing the property, he obtained an "aerial," the adjoining deeds, and previous surveys done in the area; that he observed the property line was marked with iron rods, from which he could determine a survey had been done recently; that it appeared the line had been marked after the cutting took place; that the Shanklin property contained a "fence of convenience," which, he explained, was not used to depict the property line, but was for livestock; that the fence was barbwire strands through the trees; and, that this fence was located several hundred feet into the Shanklin property.

{¶20} Doug Zimmerman testified that he was a licensed realtor and had lived in Logan County his entire life; that he had been on the Shanklin property approximately fifteen years prior to hunt mushrooms; that the "old growth," or

back area, was beautiful; that there was "a ravine running down one side of it that resembles like the TV shows you see with West Virginia with the water and the spring and a lot of trees" (id. at 182); that he believed the property was unique because it was directly across from the highest point of Ohio, had a scenic view of Logan County, and was the most scenic ground in Logan County; that, based on his real estate experience, he believed the value of the area that had been cut, prior to the cut, would be approximately $6,000 per acre; that he based this on the beauty of the property as well as the value of the trees; and, that, assuming it was a fifteen-acre area that had been cleared, he believed the aggregate value would be $90,000.

{¶21} Zimmerman continued that he had not been on the property since the cutting occurred; that he was familiar with the appraisals done by the county auditor and used those appraisals in his business; that he did not use the auditor's fair-market valuation of the property in his estimates for the Shanklin property; that, in 2007, the entire 108.68 acre Shanklin property was appraised by the auditor at $213,330, and assessed for tax purposes at $74,000; that the county auditor's valuation of property is always lower than the true fair market value; that real estate still has value even if it has no timber; and, that farmland in the area "with the timber cut off" had recently been sold for approximately $3,250 or $3,300 an acre.

-14-

{¶22} Thereafter, a video deposition of Bernice Shanklin was entered into evidence. Shanklin testified that she currently lived in Niceville, Florida; that she owned an undivided one-half interest in the Shanklin property in her individual capacity; that she owned the other half in her capacity as trustee of her late husband's, Charles Shanklin, trust; that she and Charles purchased the property in 1961 or 1962, but that she did not recall what they paid for the property; that the Shanklin family used the property exclusively for recreation, including hiking, sledding, ice skating, and swimming; that she and Charles moved to Florida in 1991, but that they continued to use the property for recreation up to 2005, when they would travel there for the weekend with their children; that she had not been to the property to inspect the results of the tree cutting; that "what they've done is destroyed that beautiful land and the virgin timber and just virtually, you know, ran roads through there" (id. at 207-08); that neither she nor Charles had ever harvested any timber from the property, nor did she ever intend to; that Stacy was her agent for purposes of handling the case since he was the caretaker of the property and lived near the property; that she was not aware whether Stacy had been compensated for his services over the years because her daughter typically talked to him; and, that she was not aware there was any contract with Stacy for his services.

{¶23} Sturgil Lowman testified that he owned Lowman Lumber Company; that he did not dispute he was responsible for his employees; that he stipulated that he cut the trees on the Shanklin property; that he did not hire a surveyor before cutting on the Shanklin or Kauffman properties; that he did not dispute that several logging roads were cut into the Shanklin property; that a "spotter" is someone in the logging industry who tried to find people who want to sell timber; that he had employed an individual named Mike Green as a spotter; that the cutting of multiple acres on the Shanklin property was a mistake, and that he "had a guy mark the line" for him (id. at 220); that he was aware it was his responsibility to know where the boundaries and property lines were; that he had hired surveyors from time to time to find boundaries so that he did not trespass; that he had been convicted of receiving stolen property and criminal damaging in Montgomery County involving tree trespass in August 2007; that there had been several judgments in civil cases against him for cutting onto neighboring property without authorization; that, in 2005, his business had gross receipts of $4,134,261; that 2005 was the year he removed trees from the Shanklin property; that it was possible his employees cut on the Shanklin's property in disregard of their rights; that the testimony about the beauty of the property was a lie because, following the ice storm, one could not even walk through the property; that Kauffman showed him the corners of the property, but did not show him the property lines;

that veneer was more valuable than regular logs; that there was probably a truckload of veneer, but that he did not know whether it came from the Shanklin or the Kauffman properties; and, that he had stated in his previous deposition that he believed there was a truckload of veneer that came from the Shanklin property.

{¶24} Thereafter, Appellees rested and Lowman moved for dismissal of Stacy as a party to the action, contending that he had no legally cognizable interest in the litigation. Lowman acknowledged that there was a stipulation entered into prior to trial concerning Stacy's status as a party, but argued that it had not been his intention to concede to Stacy's party status or vest him with an interest in the litigation. The trial court denied Lowman's motion, relying on the stipulation.

{¶25} Thereafter, Lowman presented his defense, testifying on his own behalf that he had been in the logging business for forty years; that he executed approximately twenty-five to thirty lumber contracts per year; that he paid Kauffman approximately $47,000, even though the contract was for $40,000, because Lowman retrieved more lumber than he had originally anticipated; that, when he went to look at the property with the surveyor after the cutting had taken place, he observed an old fence on the ground, and his crews had cut up to the fence, but had not gone beyond it; that he guessed approximately ten to twelve acres of the Shanklin property were involved; that, from viewing the stumps, he guessed approximately 22,000 board feet was involved, including veneer logs;

that his business had a net loss of $1,197 in 2005; and, that he had been sued about five times in his forty years of business.

**{¶26}** Thereafter, the Shanklins presented the following on rebuttal.

**{¶27}** Stacy testified that the boundary fence between the Shanklin and Kauffman properties extended from the top of a ravine to the top of the next ravine; that there was also a convenience fence on the Shanklin property; that Lowman was incorrect that the cutting did not extend past the convenience fence, because he had examined the area and found that the cutting continued beyond the fence; and, that he had photographed both the property line fence and the fence of convenience.

**{¶28}** Thereafter, the jury returned a verdict awarding Appellees compensatory damages of $45,000, resulting in trebled damages of $135,000, and punitive damages of $33,750.

**{¶29}** It is from this judgment that Lowman appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ABUSED ITS DISCRETION AND COMMITTED PLAIN ERROR BY PERMITTING AN AGENT AS A PLAINTIFF.**

*Assignment of Error No. II*

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR ABUSING ITS DISCRETION, BY FAILING TO REQUIRE**

**THAT MR. STACY'S AGENCY CONTRACT BE DISCLOSED IN WHOLE TO THE JURY.**

*Assignment of Error No. III*

**THE TRIAL COURT COMMITTED PLAIN ERROR BY ALLOWING INVALID TESTIMONY REGARDING THE COST OF RECOVERY [SIC] THERE WAS NO CREDIBLE EVIDENCE OF REPAIR COSTS FOR THE REAL ESTATE.**

*Assignment of Error No. IV*

**THE ADMISSION OF PRIOR ACTS BY APPELLANT WAS IN ERROR AND PREJUDICIAL TO THE APPELLANT.**

*Assignment of Error No. V*

**THE FINDING THAT APPELLANT WAS RECKLESS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE VERDICT RESULTED FROM THE PREJUDICIAL ADMISSION OF PRIOR ACTS.**

*Assignment of Error No. VI*

**THE AWARD OF PUNITIVE DAMAGES IN ADDITION TO TREBLE DAMAGES IS NOT APPROPRIATE WHEN THE APPELLEE FAILS TO PROVE MALICE BY CLEAR AND CONVINCING EVIDENCE.**

*Assignment of Error No. I*

{¶30} In his first assignment of error, Lowman contends that the trial court erred by permitting an agent as a plaintiff. Specifically, Lowman argues that Stacy should not have been permitted to be named as a party plaintiff because he owned no interest in the real estate, and that his only interest in the matter was an

undisclosed contract permitting him to represent Appellees and receive a contingent fee of twenty-five percent of the gross proceeds recovered.

**{¶31}** Initially, we note that Lowman failed to raise the issue of Stacy's standing as a plaintiff at the trial court level in any pleading preceding the trial, and did not even raise the issue at trial until after Appellees rested their case.

**{¶32}** Civ.R. 8(C) governs the pleading of affirmative defenses and provides, in pertinent part:

> **In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, want of consideration for a negotiable instrument, fraud, illegality, injury by fellow servant, laches, license, payment, release, *res judicata*, statute of frauds, statute of limitations, waiver, and *any other matter constituting an avoidance or affirmative defense*.**

(Emphasis added). The clear, unambiguous, and unequivocal requirement of this language is that any affirmative defense and any defense that constitutes an avoidance of liability must be specifically pleaded as an affirmative defense. If it is not properly and affirmatively set forth in a responsive pleading, the defense is waived. Additionally, Civ.R. 9(A) specifically provides that:

> **It is not necessary to aver the capacity of a party to sue or be sued or the authority of a party to sue or be sued in a representative capacity or the legal existence of an organized association of persons that is made a party. When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, he shall do so by specific negative averment, which shall include such**

**supporting particulars as are peculiarly within the pleader's knowledge.**

**{¶33}** Here, the record reflects that Lowman failed to timely and properly raise the issue of Stacy's standing in the trial court, waiving the issue on appeal. See *Kirk Bros. Co., Inc. v. Advanced Aquatics, Inc.*, 3d Dist. No. 13-07-15, 2008-Ohio-621, ¶4 (finding that "if capacity to sue is not raised by specific negative averment under Civ.R. 9(A), it will be waived under Civ.R. 12(H)"). See also *Discover Bank v. Poling*, 10th Dist. No. 04AP-1117, 2005-Ohio-1543, ¶8 (finding that failure to raise the issue of standing as an affirmative defense waives the issue).

**{¶34}** Further, even had Lowman properly pleaded the issue of Stacy's standing, we would find his argument to be meritless given the parties' stipulation.

**{¶35}** "'[A] stipulation is a voluntary agreement between opposing counsel concerning disposition of some relevant point so as to obviate the need for proof or to narrow the range of litigable issues.'" *Julian v. Creekside Health Center*, 7th Dist. No. 03MA21, 2004-Ohio-3197, ¶54, quoting *DeStephen v. Allstate Ins. Co.*, 10th Dist. No. 01AP-1071, 2002-Ohio-2091, ¶17, quoting *Horner v. Whitta*, 3d Dist. No. 13-93-33, 1994 WL 114881. "Ohio courts have long recognized the validity of stipulations." *Albertson v. Ryder*, 11th Dist. No. 91-L-103, 1992 WL 192454, citing *Garrett v. Hanshue* (1895), 53 Ohio St. 482, 495. Stipulations waive the necessity to produce evidence or the authentication of evidence. 89

Ohio Jurisprudence 3d (1989) 114, 115, Trial, Section 77. A stipulation that is filed with and accepted by the court is binding on the parties and "is a fact deemed adjudicated for purposes of determining the remaining issues in the case." *Whitehall ex rel. Fennessy v. Bambi Motel* (1998), 131 Ohio App.3d 734, 742. "A party who has agreed to a stipulation cannot unilaterally retract or withdraw from it." Id., citing *Horner*, supra.

{¶36} Here, in April 2010, the trial court filed an entry reflecting that "Plaintiffs and Defendants agree that all the parties who have or could claim a legal interest in the subject real estate are now joined as Plaintiffs herein" (Apr. 2010 Judgment Entry, p. 1). Consequently, we find that Lowman cannot now unilaterally retract his agreement to the stipulation based solely on his bald assertion that he did not intend to concede Stacy's party status.

{¶37} Finally, we would also find that Lowman cannot now raise the issue of Stacy's party status under the invited error doctrine. It is well-established that "'[a] party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make.'" *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Company* (1986), 28 Ohio St.3d 20, 28, fn. 16, quoting *Lester v. Leuck* (1943), 142 Ohio St. 91, paragraph one of the syllabus. Here, Lowman had ample opportunity to explore Stacy's party status in discovery preceding the trial, but apparently elected not to, and actually stipulated that the proper parties were

before the court. Lowman did not even raise the issue of Stacy's party status at trial until after Appellees had rested their case. Consequently, we find that Lowman invited any error concerning Stacy's party status.

{¶38} Accordingly, we overrule the first assignment of error.

*Assignment of Error No. II*

{¶39} In his second assignment of error, Lowman asserts that the trial court erred in failing to require that Stacy's agency contract be disclosed to the jury. Specifically, Lowman contends that Stacy had an obvious motive to present the facts in a light most favorable to Appellees, given the undisclosed agency contract, but that his appearance of altruism elicited juror sympathy to which he was not entitled.

{¶40} Initially, we note that Lowman did not raise the issue of disclosure of Stacy's agency contract at trial. As such, he has waived all but plain error regarding disclosure of the agency contract. See *State v. Miller*, 3d Dist. No. 1-09-32, 2009-Ohio-6157, ¶5, citing *State v. Stewart*, 3d Dist. No. 16-08-11, 2008-Ohio-5823; *State v. Marbury* (1995), 104 Ohio App.3d 179, 181.

{¶41} "The Supreme Court of Ohio has discussed the application of the plain error doctrine in civil cases, finding that, '[i]n appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was

made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself .'" *Kritzwiser v. Bonetzky*, 3d Dist. No. 8-07-24, 2008-Ohio-4952, ¶20, quoting *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, at syllabus. "'A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings.'" Id., quoting *Schade v. Carnegie Body Co.* (1982), 70 Ohio St.2d 207, 209.

{¶42} Here, we do not find that the trial court's failure to sua sponte require disclosure of Stacy's agency contract resulted in a manifest miscarriage of justice. Despite Lowman's general assertion that Stacy created an appearance of altruism that elicited unwarranted sympathy from the jury, we cannot find that these constitute the type of "exceptional circumstances" that challenge "the legitimacy of the underlying judicial process." This is particularly so given that Stacy admitted on cross-examination that he and the Shanklins agreed he would be paid for his time, and also that much of Stacy's testimony concerning the volume and value of the stolen timber was corroborated by expert witnesses.

{¶43} Accordingly, we overrule Lowman's second assignment of error.

*Assignment of Error No. III*

{¶44} In his third assignment of error, Lowman argues that the trial court committed plain error by allowing invalid testimony regarding the cost of recovery, and that there was no credible evidence establishing repair costs for the Shanklin property. Specifically, Lowman contends that the only evidence regarding the repair costs was Stacy's testimony that it would cost $15,000 to $20,000 to turn the property into a field; that Stacy's testimony was invalid because he was not the owner of the property and had not been qualified as an expert; that the loss of the use of the property was marginal at best, given that the Shanklins lived in Florida and there had been an ice storm; and, that the award for damages should only have included stumpage, with an additional amount for the veneer wood.

{¶45} At trial, Appellee's counsel inquired of Stacy, "have you attempted to or have you come up with a number if you were going to perform and could devote the necessary time to perform cleaning up of the property to turn it into just a field," to which he replied, $15,000 to $20,000, which "would include * * * the number of days you would have to have a backhoe or bulldozer in there to gather and move these tops basically while you have a brush hog in there making paths to them and to be able to continue to brush hog once the big stuff is moved." (Trial Tr., p. 121).

{¶46} We first note that Lowman made no objection to the proffered question or Stacy's answer. Consequently, Lowman waived any challenge to the admission of this evidence on appeal, save plain error. See *Proctor v. Wolber*, 3d Dist. No. 5-01-38, 2002-Ohio-2593, ¶51. As stated previously, plain error is obvious and prejudicial; the plain error doctrine is not favored; and, plain error should be applied only in extremely rare cases involving exceptional circumstances, where the error challenges the legitimacy of the judicial process. *Kritzwiser*, 2008-Ohio-4962, at ¶20.

{¶47} Additionally, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Const. Co.* (1978), 54 Ohio St.2d 279, 280. "[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶24, citing *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80-81. Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment. Id.

{¶48} We do not find that admission of Stacy's testimony resulted in an obvious and prejudicial error as set forth in *Kritzwiser*, supra. The jury awarded

Appellees compensatory damages of $45,000, which was supported by competent, credible evidence even disregarding Stacy's testimony about costs to repair the property. Realtor Doug Zimmerman testified that he valued the Shanklin property at $6,000 per acre prior to the cutting of the timber, or $90,000 for the purported fifteen acres that had been cleared. Additionally, Zimmerman testified that cleared farmland in the area had recently sold for $3,250 or $3,300 per acre, which this Court computes to be $48,750 or $49,500 for fifteen acres. Consequently, Zimmerman presented evidence that the diminution in value of the Shanklin property due to the cutting was approximately $41,250 or $40,500. Further, expert James Bartlett testified that he estimated the *minimum* value of the timber to be $30,671, but that it was possible, due to competitive bidding, that the Shanklins could have sold the timber for more than the minimum value; that, in some competitive bidding situations, the high bid could be double the low bid; and, that he was unable to put a value on the loss of beauty to the property due to the cutting. We find that, even independent of Stacy's testimony, Zimmerman's and Bartlett's testimony was competent, credible evidence supporting the jury award of compensatory damages. Therefore, Lowman has failed to demonstrate he was prejudiced by the admission of Stacy's testimony, or that the compensatory damages award was against the manifest weight of the evidence.

{¶49} Accordingly, we overrule Lowman's third assignment of error.

*Assignment of Error No. IV*

**{¶50}** In his fourth assignment of error, Lowman argues that admission of evidence of his prior acts was error and was prejudicial to him. Specifically, Lowman contends that the admission of evidence of his prior convictions and judgments for prior trespass incidents was prejudicial because these prior instances were not of the same nature.

**{¶51}** Evid.R. 404 is applicable in civil and criminal cases. *Jacobs v. Gupta*, 3d Dist. No. 1-99-85, 2000-Ohio-1815, citing Weissenberger's Ohio Evidence, Treatise (2000) 102, Section 404.4; *State v. Mason* (1998), 82 Ohio St.3d 144, 160. Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Additionally, under Evid.R. 401, evidence is relevant where it has "[a]ny tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Consequently, evidence of prior acts is relevant where it tends to prove one of the purposes enumerated in Evid.R. 404(B), such as absence of mistake or accident. "However, even if the other acts testimony is admissible under Evid.R. 404(B), the trial court must exclude the

evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Jacobs*, supra, citing Evid.R. 403(A).

**{¶52}** At trial, Lowman testified that he had been convicted of receiving stolen property and criminal damaging in Montgomery County involving tree trespass in August 2007, and that there had been several judgments in civil cases against him for cutting onto neighboring property without authorization. Lowman fails to explain how the prior civil judgments against him were of a different nature than the current incident. Additionally, although Lowman contends that the Montgomery County criminal case involved his making of a contract with a lessor, rather than the landowner, and not a property line violation, this prior instance is still relevant as it involved Lowman removing timber from property without authorization, and Lowman fails to explain how the factual differences involved in the Montgomery County case render it irrelevant. Finally, we do not find that the significant probative value of these prior incidents in demonstrating lack of mistake was substantially outweighed by the danger of unfair prejudice.

**{¶53}** Accordingly, we overrule Lowman's fourth assignment of error.

*Assignment of Error No. V*

**{¶54}** In his fifth assignment of error, Lowman argues that the finding that he was reckless was against the manifest weight of the evidence and that the

verdict resulted from the prejudicial admission of prior acts. Specifically, Lowman argues that, although this argument would typically fail due to the reviewing court's deference to the trial court, this particular proceeding was tainted by the testimony of Stacy, an "officious intermeddler," and the admission of his prejudicial testimony.

{¶55} As we stated previously, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. *C.E. Morris Co.,* 54 Ohio St.2d at 280. "[W]hen reviewing a judgment under a manifest-weight-of-the-evidence standard, a court has an obligation to presume that the findings of the trier of fact are correct." *Wilson*, 113 Ohio St.3d 382, at ¶24. Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment.

{¶56} R.C. 901.51, which governs injury to trees, provides that:

**No person, without privilege to do so, shall recklessly cut down, destroy, girdle, or otherwise injure a vine, bush, shrub, sapling, tree, or crop standing or growing on the land of another or upon public land.**

**In addition to the penalty provided in section 901.99 of the Revised Code, whoever violates this section is liable in treble damages for the injury caused.**

{¶57} Additionally, R.C. 2901.22(C) provides that "[a] person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." See *Guarino v. Farinacci*, 11th Dist. No. 2001-L-158, 2003-Ohio-5980, ¶40.

{¶58} Here, in our resolution of Lowman's first assignment of error, we found that he failed to timely and properly raise the issue of Stacy's standing in the trial court, waiving the issue on appeal, and further, that he stipulated to Stacy's status as a plaintiff. Further, in our resolution of Lowman's fourth assignment of error, we found that the trial court properly admitted evidence of his prior acts. Finally, evidence was heard at trial that an individual identifying himself as representing Lowman Lumber approached Stacy and inquired about harvesting the timber on the Shanklin property; that the man offered Stacy $10,000 if he could convince the Shanklins to let his company harvest the timber; that Stacy declined the offer and gave no indication that the Shanklins were willing to sell timber to Lowman; that Stacy eventually discovered that twelve to fifteen acres of the Shanklin property had been cut; that a logging road had been cut nearly a quarter of a mile into the Shanklin property from the Kauffman

property line; that there were two points of entry into the Shanklin property with approximately twenty branches off the main logging road; that there was a fence marking the property line between the Shanklin property and the Kauffman property; that the main logging road went through the fence line and the fence had been cut off and rolled up; that a professional surveyor identified the property line between the Kauffman and Shanklin properties, and observed that cutting had taken place across the line onto the Shanklin property; that the cutting extended five or six hundred feet across the property line; that Lowman did not hire a surveyor before cutting on the property, and that Kauffman showed him the corners of the property, but did not show him the property lines; and, that Lowman admitted he had previously been convicted of receiving stolen property and criminal damaging involving tree trespass in August 2007, and that there had been several judgments in civil cases against him for cutting onto neighboring property without authorization.

{¶59} We find that the preceding constitutes competent, credible evidence that Lowman perversely disregarded a known risk with heedless indifference to the consequences. Consequently, we find that the verdict was not against the manifest weight of the evidence.

{¶60} Accordingly, we overrule Lowman's fifth assignment of error.

*Assignment of Error No. VI*

**{¶61}** In his sixth assignment of error, Lowman contends that the award of punitive damages in addition to treble damages was not appropriate because Appellees failed to prove malice. Specifically, Lowman argues that the jury awarded Appellees $35,000 in punitive damages and $135,000 in treble damages, and that no malice supported this award.

**{¶62}** "An award of punitive damages in a tort case may be made only upon a finding of actual malice on the part of the defendant." *Niskanen v. Giant Eagle, Inc.*, 9th Dist. No. 23445, 2008-Ohio-1385, ¶38, overruled on other grounds by *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626. "'Actual malice' for these purposes is '(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" (Emphasis omitted.) *Calmes v. Goodyear Tire & Rubber Co.* (1991), 61 Ohio St.3d 470, 473, quoting *Preston v. Murty* (1987), 32 Ohio St.3d 334, syllabus. Further, the Supreme Court of Ohio has held that when ordering punitive damages, the trier of fact is to make a "reasoned determination* * *of an amount that fairly punishes the tortfeasor for his malicious or malevolent acts and that will deter others from similar conduct." *Digital & Analog Design Corp. v. North Supply Co.* (1992), 63 Ohio St.3d 657,

660, overruled on other grounds in *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 557.

**{¶63}** This Court has previously held that "an award of punitive damages is within the discretion of the finder of fact. The award will not be overturned unless it bears no rational relationship or is grossly disproportionate to the award of compensatory damages." *Gollihue v. Consolidated Rail Corp.* (1997), 120 Ohio App.3d 378, citing *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 16.

**{¶64}** We find that the evidence enumerated in our analysis of Lowman's fifth assignment of error, that Lowman logged fifteen acres of mature tree growth without obtaining a survey or being shown the property line, rises to the level required to demonstrate "a conscious disregard for the rights * * * of other persons that has a great probability of causing substantial harm." Consequently, we find sufficient evidence of malice existed to support the jury's award of punitive damages.

**{¶65}** Accordingly, we overrule Lowman's sixth assignment of error.

**{¶66}** Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**PRESTON and WILLAMOWSKI, J.J., concur.**
**/jnc**