[Cite as *Brewer v. Dick Lavy Farms, L.L.C.*, 2016-Ohio-4577.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## DARKE COUNTY

| | | |
|---|---|---|
| JAMES BREWER | : | |
| | : | |
| *Plaintiff-Appellee* | : | Appellate Case No. 2015-CA-7 |
| | : | |
| v. | : | Trial Court Case No. 2013-CV-663 |
| | : | |
| DICK LAVY FARMS, LLC, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| *Defendant-Appellant* | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 24th day of June, 2016.

. . . . . . . . . .

JOSE M. LOPEZ, Atty. Reg. No. 0019580, 18 East Water Street, Troy, Ohio 45373
        Attorney for Plaintiff-Appellee

EDWARD J. DOWD, Atty. Reg. No. 0018681, KEVIN A. LANTZ, Atty. Reg. No. 0063822,
8163 Old Yankee Street, Suite C, Dayton, Ohio 45458
        Attorneys for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Defendant-Appellant, Dick Lavy Farms, L.L.C. ("DLF"), appeals from a judgment of $148,350 in favor of Plaintiff-Appellee, James Brewer. In support of its appeal, DLF contends that the trial court erred in failing to apply DLF's common law privilege to cut off, sever, destroy, mutilate, or otherwise eliminate branches of an adjoining tree that encroaches on its property. DLF further contends that the trial court erred by failing to apply prior authority in our district regarding the proper measure of damages. Alternatively, DLF contends that the trial court's damages holding was against the manifest weight of the evidence.

{¶ 2} DLF also argues that the trial court erred when it found that Lavy negligently trespassed on Brewer's land. Alternatively, DLF maintains that this finding was against the manifest weight of the evidence. Finally, DLF argues that the court's finding of recklessness was against the manifest weight of the evidence.

{¶ 3} We conclude that the trial court's judgment regarding damages was against the manifest weight of the evidence. However, the remaining assignments of error are without merit. Accordingly, the judgment of the trial court will be affirmed as to liability and reversed as to damages. This matter will be remanded for a new hearing on damages.

I. Facts and Course of Proceedings

{¶ 4} Around 2006, James Brewer purchased slightly over 70 acres of property on Hartle Road in Darke County, Ohio, for $180,000. About 30 acres of the land were tillable, and 40 acres were wooded. The only access to the tillable and wooded property was via a 20-25 foot wide lane.

{¶ 5} When Brewer purchased the property, the former owner had allowed DLF to farm the property, and the lane was never used. As a result, trees had grown up in the center of the lane. Brewer trimmed these trees and made a tunnel out of the lane to access the rest of the property. The lane ran west to east for about 3,600 feet, and had trees on both the north and south sides of the lane. DLF's property bordered Brewer's property on the south. The trees in the fence row were a woodland mix; none of the trees were ornamental or unique.

{¶ 6} In January 2013, Dick Lavy, DLF's owner, ordered his employee, Bill Hawkey, to clear the fence row between the two properties. At the time, Lavy understood that he could clear brush straight up and down the property line. Clearing a fence row is important for crops, because trees will grow out and take over a field. In addition, the tree growth impacts the yield and growth of crops that are planted, and poses a hazard to farm equipment.

{¶ 7} Lavy sent Hawkey out with a track hoe, which was the equipment that he had available. DLF presented testimony that this is a standard method of clearing fence rows in Darke County, Ohio.

{¶ 8} Hawkey used a 200 John Deer track hoe, which had an arm that could reach about 15 feet in the air. The track hoe had a bucket at the end of the arm. Hawkey had used the track hoe in the past, while clearing fence rows for DLF. Using the track hoe, Hawkey reached up, grabbed limbs, and pulled on them, trying to break them off cleanly. While reaching up, Hawkey attempted to keep the track hoe on DLF's side of the property. There were occasions when a branch would snap off or tear the tree on Brewer's side. Occasionally, a tree branch would fall on Brewer's side, and Hawkey would reach over

and grab the branch to clean up. Hawkey stated that he never consciously reached over with the bucket to try and break a branch at the tree trunk that was on Brewer's side of the property. Hawkey did indicate that he could not always control the damage to a tree that he would touch with the track hoe. However, he never consciously attempted to reach over the fence for any reason other than cleaning up debris. During this process, Hawkey was also clearing trees that were on DLF's side of the fence.

{¶ 9} Brewer did not live at the property on Hartle Road. When he learned that DLF was clearing the fence row, he went out to look at the property. At that point, the track hoe was about halfway down the fence row, destroying trees. Brewer called the police on January 18, 2013, to complain. After speaking with Brewer, Darke County Sheriff's Deputy, Thomas Nichols, contacted the Darke County Prosecutor, and then called Lavy to tell him that a complaint had been made. Nichols told Lavy of his concern that civil or criminal issues could be involved in what he was doing. Lavy stated that he had a right to take down any branches that were hanging over his property. In addition, Lavy said he would let Brewer remove the branches if Brewer wanted to do so, but he wanted the branches removed before crop season began in March or April.

{¶ 10} Nichols then told Brewer about Lavy's position. Nichols told Brewer that Lavy had said that he was allowed to take tree branches from his side, and that if Brewer did not like the way he was doing it, Brewer could cut them himself. Nichols went out the following day and took photos of the property. Nichols observed some damage on Brewer's side of the line. Brewer told Nichols that he was going to have an expert look at the trees. Nichols asked Brewer to give him an estimate of the damages, but never received an estimate. Nichols then filed a report and sent the report to the prosecutor's

office for review.    No charges were brought as a result of the incident.

{¶ 11} Although Nichols had suggested that Lavy obtain legal advice before continuing, Lavy told Hawkey to continue clearing the fence row.    Knowing that Brewer was upset, Lavy told Hawkey not to clean up any branches that fell on Brewer's side.    After finishing clearing the line, Hawkey dug a hole on DLF's side and burned the tree debris using a controlled burn.    Before Hawkey burned the debris, he called the fire department.

{¶ 12} Within days after the damage occurred, Brewer's wife took photos of the trees.    In April 2013, Brewer and arborist, David Furlong, walked in DLF's field and the lane.    They counted the damaged trees, disregarding anything less than three inches in diameter.    They counted 326 trees that had been damaged.

{¶ 13} In November 2013, Brewer filed suit against DLF, alleging three claims: (1) a violation of R.C. 901.51; (2) reckless trespass; and (3) negligent trespass.    DLF filed an answer and counterclaim, based on Brewer's alleged damage to a culvert on DLF's property in the summer of 2012.

{¶ 14} Prior to trial, the court filed a decision discussing cross motions in limine the parties had filed concerning the proper measure of damages.    The court held that Brewer was not limited to damages for diminution in value, and the court would apply a standard that allowed recovery of the costs of restoration.

{¶ 15} The case was subsequently tried to the bench on March 10 and 11, 2015. The court had also previously viewed the scene in October 2014.    Following the trial, the court filed a decision, awarding Brewer $148,350 in damages, including treble damages of $133,515.    This appeal followed.

II.  Common Law Privilege

{¶ 16} DLF's First Assignment of Error states that:

The Trial Court Erred as a Matter of Law to the Prejudice of DLF When It Failed to Apply Appellant's Common Law Privilege, Based on the Ohio Constitution, to Cut Off, Sever, Destroy, Mutilate, or Otherwise Eliminate Branches of an Adjoining Landowner's Tree that Encroached on Its Land, and Erroneously Created a Conflict between the Privilege and R.C. 901.51.

{¶ 17} Under this assignment of error, DLF contends that it had a common law privilege to sever or eliminate overhanging branches in any manner that it desired, and that the trial court nullified the privilege by holding that DLF could not cause breakage that impacts the tree on the other side of the property line.   According to DLF, this holding emasculates the common law privilege and creates a conflict between R.C. 901.51 and a property owner's constitutional rights.

{¶ 18} R.C. 901.51 provides that:

No person, without privilege to do so, shall recklessly cut down, destroy, girdle, or otherwise injure a vine, bush, shrub, sapling, tree, or crop standing or growing on the land of another or upon public land.   In addition to the penalty provided in section 901.99 of the Revised Code, whoever violates this section is liable in treble damages for the injury caused.

{¶ 19} "A privilege existed at common law, such that a landowner could cut off, sever, destroy, mutilate, or otherwise eliminate branches of an adjoining landowner's tree

that encroached on his land." *Alh Properties, P.L.L. v. Procare Automotive Serv. Sols., L.L.C.*, 9th Dist. Summit No. 20991, 2002-Ohio-4246, ¶ 18, citing *Murray v. Heabron*, 35 O.O. 135, 135, 74 N.E.2d 648 (C.P.1947).

{¶ 20} R.C. 901.51 was enacted in 1974, replacing former R.C. 2907.44, which contained essentially the same provisions.   The only difference is that the former statute carried a penalty of a fine or imprisonment, while the new statute provided an additional right to treble damages for reckless behavior.   *Wooten v. Knisley*, 79 Ohio St.3d 282, 285-86 and fn. 2, 680 N.E.2d 1245 (1997).

{¶ 21} In *Wooten*, the court held that "the term 'recklessly,' as that term is used in R.C. 901.51, has the same meaning in a civil claim for treble damages under R.C. 901.51 as it does in a criminal proceeding involving a violation of that statute.   Specifically, the term 'recklessly,' as it is used in R.C. 901.51, is defined in R.C. 2901.22(C)."   *Id.* at 289-90.   Under R.C. 2901.22(C):

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature.   A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.[1]

{¶ 22} As an initial matter, we disagree with DLF, insofar as it argues that

---

[1] This is taken from the new version of R.C. 2901.22(C) that became effective on March 23, 2015.   However, there is no significant distinction between the wording of the new statute and the version applied in *Wooten.*

individuals exercising their common law privilege to cut down branches could never be held liable for doing so. Clearly, that is not the case, as even in situations involving common law privilege, a landowner should not act in a manner as to cause damage to the property of an adjoining landowner. Thus, while a privilege exists, it is not absolute.

{¶ 23} In *Newport Harbor Assn. v. DiCello*, 8th Dist. Cuyahoga No. 87126, 2006-Ohio-4493, the court observed that "the law holds a high regard for an individual's right to own property and treats harshly those who infringe upon that right. In the absence of some agreement to the contrary, a property owner has no right to encroach on the land of another." (Citations and footnote omitted.) *Id.* at ¶ 28. The court went on to note that "it is a well-recognized principle of common law that a landowner has the right to protect his own land from threatened injury, even though, in doing so, he produces a condition that injures adjoining land, *provided he acts with reasonable care.* Ohio has recognized the right of a property owner to use self-help in removing encroachments on his property. Other jurisdictions also recognize the right of an owner to remove any encroachment on his property which deprives him of the complete enjoyment of his land." (Citations and footnotes omitted.) (Emphasis added.) *Id.* at ¶ 29.

{¶ 24} The critical phrase is "reasonable care." DLF's privilege to remove encroachments was limited by the use of reasonable care not to injure neighboring property. By imposing a standard of recklessness, which requires a higher degree of fault, R.C. 901.51 does not interfere with the common law privilege. We also stress that owners have an absolute right to destroy any vegetation on their own side of the property; liability attaches only where, as here, the owners' actions create harm on the other side of the property line.

{¶ 25} By way of analogy, R.C. 971.08 allows owners or contractors to enter up to ten feet onto adjoining property to build and maintain partition fences. However, the owner or contractor is statutorily "liable for all damages caused by the entry onto the adjoining property, including damages to crops." *Id.* Again, a privilege exists, but it is not unlimited. Whether or not DLF used reasonable care is a subject we will consider in connection with DLF's Third Assignment of Error.

{¶ 26} Based on the preceding discussion, the First Assignment of Error is overruled.

### III. The Proper Measure of Damages

{¶ 27} DLF's Second Assignment of Error states that:

> The Trial Court Erred as a Matter of Law to the Prejudice of DLF
> When It Failed to Apply this Court's Measure of Damages as the Diminution
> of Appellee's Property Value; in the Alternative, the Court's Holding on the
> Issue of Damages Was Against the Manifest Weight of the Evidence.

{¶ 28} Under this assignment of error, DLF contends that the trial court erred in failing to apply the measure of damages we outlined in *Blust v. Lamar Advertising Co.*, 157 Ohio App.3d 787, 2004-Ohio-2433, 813 N.E.2d 902 (2d Dist.). In *Blust*, an advertising agency leased a small piece of farmland near the property line of two farms, in order to erect a billboard. A wire fence, mostly concealed in brush, vines, and trees, separated the two farms. *Id.* at ¶ 6. A local company, who was hired to remove trees and vegetation, cut down 34 trees that were growing wild on the adjoining landowner's property. 17 of the trees were more than three inches in diameter. *Id.* at ¶ 7.

**{¶ 29}** The jury awarded $32,000 in compensatory damages and more than $2,000,000 in punitive damages. *Id.* at ¶ 8. The trial court indicated that it would grant a new trial on all issues, including liability, unless the plaintiffs accepted a remittitur of the punitive damages award to $550,316.80, with half going to a nonprofit nature conservancy. After the plaintiffs refused, the trial court ordered a new trial, and the plaintiffs appealed. *Id.* The advertising agency (Lamar) also cross-appealed. *Id.*

**{¶ 30}** We first concluded that the trial court had abused its discretion by requiring plaintiffs to prove entitlement to both compensatory damages and punitive damages a second time, without providing a good reason for the plaintiff to do so. *Id.* at ¶ 20. We did agree that the punitive damages award was "unreasonable and disproportionate to the harm caused." *Id.* at 44. As a result, we remanded the case for a new trial solely on punitive damages. *Id.* at ¶ 46.

**{¶ 31}** In a cross-assignment of error, the advertising agency argued that the trial court should not have submitted the punitive damages issue to the jury. In response, the majority of the panel held that the agency had acted with conscious disregard for the adjoining landowners' rights by cutting the trees on their property. *Blust*, 157 Ohio App.3d 787, 2004-Ohio-2433, 813 N.E.2d 902, at ¶ 32.[2] The majority noted, however, that a closer question was whether the agency's agent knew that the act of cutting the trees would cause substantial harm. *Id.* at ¶ 34. We observed that to evaluate this issue, some measure of value would have to be assigned to the trees. *Id.* at ¶ 35. We first found that the agent had no awareness of two potential harms – the possibility that

---

[2] One panel member concluded that the trial court should have directed a verdict on punitive damages. *Blust*, 157 Ohio App.3d 787, 2004-Ohio-2433, 813 N.E.2d 902, at ¶ 48-52 (Brogan, J., dissenting in part).

the plaintiffs would ever subdivide their farm for residential purposes, or the possibility of future prospects of marketing veneer. *Id.* at ¶ 36. Of note to the case currently before us, we then stated that:

> Likewise, with regard to the cost of replanting the trees, no reasonable trier of fact could find that [the agent] was aware that cutting the Blusts' trees had a great probability of resulting in harm valued at $40,566.33 to purchase and replant all of the trees or even $24,335 to replant 11 of the larger trees. We reach this conclusion for two reasons. First, photographs reveal that the felled trees comprised a small part of a tree line dividing two farms. Given the location of the trees, which were growing wild near a rural road, Kramer could not have anticipated a great probability of the Blusts', who did not even reside on the property, desiring to replant the trees. Second, replacement cost is not the typical measure of the harm when wild trees are cut. When a party trespasses and cuts trees that are part of a woodland mix and not unique, the ordinary measure of the harm is the difference in the fair market value before and after the cutting. *See, e.g., Kapcsos v. Hammond* (1983), 13 Ohio App.3d 140, 141, [468 N.E.2d 325]. Therefore, despite the jury's compensatory damage award of $32,000, Kramer could not reasonably be found to have disregarded a great probability of causing harm of this magnitude.

*Blust* at ¶ 37.

{¶ 32} DLF brought the *Blust* decision to the trial court's attention. However, prior to trial, the court decided it would apply the following standard from a decision of the Fifth

District Court of Appeals:

> "[I]n an action for compensatory damages for cutting, destroying and damaging trees and other growth, and for related damage to the land, when the owner intends to use the property for a residence or for recreation or for both, according to his personal tastes and wishes, the owner is not limited to the diminution in value (difference in value of the whole property before and after the damage) or to the stumpage or other commercial value of the timber. He may recover as damages the costs of reasonable restoration of his property to its preexisting condition or to a condition as close as reasonably feasible, without requiring grossly disproportionate expenditures and with allowance for the natural processes of regeneration within a reasonable period of time."

*Fronsman v. Risaliti*, 5th Dist. Stark No. 2008CA00028, 2008-Ohio-5074, ¶ 32, quoting *Denoyer v. Lamb*, 22 Ohio App.3d 136, 138-139, 490 N.E.2d 615 (1st Dist. 1984). (Other citations omitted.)

{¶ 33} At trial, Brewer's expert, David Furlong (an arborist), testified that removing the damaged trees would cost $55,000, and the cost of replacing the trees would be $138,000, plus $13,510 in sales tax.[3] Brewer did not testify as to any diminution in the fair market value of his property. DLF's expert, Dr. Sydnor (an arboriculture consultant with a Ph.D. in plant physiology and horticulture), testified that the life expectancy and service life functionality of the fence row was not affected by the manner in which the trees were pruned. Dr. Sydnor observed essentially the same conditions on both the

---

[3] This is almost 10% in sales tax.

north and south side of the fence row. He valued the fence row as a woodland edge fence and stated that real estate or market value would be the proper approach for assessing damages. Finally, another expert for DLF indicated that the fair market value of Brewer's property was the same before and after the incident. *See* Defense Ex. H.

**{¶ 34}** In ruling on damages, the trial court applied the damages standard from *Fronsman* and *Denoyer* and allowed recovery of restoration costs. In this regard, the court first concluded that Dr. Sydnor's opinions about cost of repair and damages were not credible because Sydnor "strained too hard to reach the unreasonable conclusion that there was no harm to the Plaintiff's trees." April 6, 2015 Decision and Entry, p. 14. However, while finding Furlong's expert testimony credible about "disease, death, susceptibility, and other harm to the trees after the blunt force tearing of limbs," the court also said that "Furlong's opinions regarding the cost to repair the damages are problematic." *Id.* at p. 15. The court then found that tree removal was unnecessary, and discounted the $55,000 cost. In addition, the court concluded that $138,000 for replacement was excessive and reduced that amount by 50%. The court also deducted 14% for ash tree disease, which had caused the death of a number of trees on both sides of the lane.

**{¶ 35}** Based on these calculations, the court arrived at $59,340 in compensatory damages. Next, the court decided that DLF had been negligent for one-fourth of the property (or about 1,000 feet), and was reckless in trimming the remaining part of the fence row. As a result, the court awarded $14,835 for negligence, and $44,505 for DLF's recklessness. Pursuant to R.C. 901.51, the court trebled this latter amount to $133, 515. The total award, therefore, was $148,350.

{¶ 36} As was noted, DLF argues that the trial court should have applied the damages standard from *Blust*, which states that "[w]hen a party trespasses and cuts trees that are part of a woodland mix and not unique, the ordinary measure of the harm is the difference in the fair market value before and after the cutting." *Blust*, 157 Ohio App.3d 787, 2004-Ohio-2433, 813 N.E.2d 902, at ¶ 37.

{¶ 37} *Blust* relied on *Kapcsos v. Hammond*, 13 Ohio App.3d 140, 468 N.E.2d 325 (9th Dist.1983), in which the court held that "[i]f the replacement or restoration cost of the trees is sought to be recovered, there must also be evidence indicating that the trees were ornamental, i.e., trees having a calculable value separate from that of the land upon which they stood, rather than those indigenous to the area." *Id.*

{¶ 38} After *Kapcsos*, but before *Blust*, we issued a decision in a case involving Dayton Power and Light's removal of ninety redbud trees from a property. *Jones v. Dayton Power & Light Co.*, 2d Dist. Greene No. 94-CA-49, 1994 WL 702062, *1 (Dec. 14, 1994). Although DP&L was found negligent, the trial court did not award any damages. *Id.*

{¶ 39} We noted the general rule under *Ohio Collieries Co. v. Cocke*, 107 Ohio St. 238, 140 N.E. 356 (1923), which was that "recoverable restoration costs are limited to the difference between the pre-injury and post-injury fair market value of the real property." *Id.* at *2. We stressed an exception, however, in which "restoration costs may be recovered in excess of diminution in fair market value when real estate is held for non-commercial use, when there are reasons personal to the owner for seeking restoration, and when the diminution in fair market value does not adequately compensate the owner for the harm done." *Id.*, citing *Thatcher v. Lane Const. Co.*, 21 Ohio App.2d 41, 254

N.E.2d 703 (10th Dist.1970), and *Denoyer*, 22 Ohio App.3d at 136, 490 N.E.2d 615.

{¶ 40} We went on to observe that:

Ohio courts have applied the restoration cost exception in a variety of situations, such as when damaged trees have been maintained for a specific, identifiable purpose, like recreation, or a sight, sound, or light barrier, when damaged trees are essential to the planned use of the property, and when the damaged trees had a calculable value separate from the land. *See, e.g., Thatcher, supra; Denoyer, supra; Schuyler v. Miller* (1990), 70 Ohio App.3d 290; *Kapcsos v. Hammond* (1983), 13 Ohio App.3d 140. However, this is not to say that these are the only situations when the exception should be applied. The *Denoyer* decision specifically explains that the destruction of shade and ornamental trees justifies restoration cost as a measure of damages, as does the destruction of trees that form part of an ecological system of personal value to the owner.

*Jones* at *3.

{¶ 41} Ultimately, we held that restoration costs would be appropriate because "the Joneses held the property as a personal residence, * * * the injured trees were ornamental, blooming, redbud trees, and * * * the Joneses articulated personal reasons for restoring the property to its pre-injury condition in accordance with their personal tastes and wishes." *Id.* at *4. We further concluded that where the exception applies, "the reasonableness of restoration costs as the measure of damages pursuant to the exception recognized in Ohio is not exclusively determined by comparing the proven cost of restoration to the diminution in value of the property, but should instead be determined

by considering whether the proposed cost is grossly disproportionate to the entire value of the injured property." *Jones*, 2d Dist. Greene No. 94-CA-49, 1994 WL 702062, at *5. Thus, contrary to DLF's claim, we have not only applied diminution in value as a standard.

**{¶ 42}** Our decision in *Jones* is generally consistent with the later decision of the Supreme Court of Ohio in *Martin v. Design Constr. Servs., Inc.*, 121 Ohio St.3d 66, 2009-Ohio-1, 902 N.E.2d 10, which settled a conflict among districts concerning whether a plaintiff must prove diminution in market value in actions involving temporary damage to property. *Id.* at ¶ 11-12. After discussing decisions that were issued after *Ohio Collieries*, the Supreme Court of Ohio stated that:

> The rule expressed in *Ohio Collieries*, that damages for temporary injury to property cannot exceed the difference between market value immediately before and after the injury, is limited. In an action based on temporary injury to noncommercial real estate, a plaintiff need not prove diminution in the market value of the property in order to recover the reasonable costs of restoration, but either party may offer evidence of diminution of the market value of the property as a factor bearing on the reasonableness of the cost of restoration.

*Martin* at ¶ 24, discussing *Ohio Collieries*, 107 Ohio St. at 238, 140 N.E. 356. The court went on to state that "[w]hile evidence of loss in market value of the property may be relevant, the essential inquiry is whether the damages sought are reasonable. Either party may introduce evidence to support or refute claims of reasonableness, including evidence of the change in market value attributable to the temporary injury. But proof of diminution in value is not a required element of the injured party's case." *Id.* at ¶ 25.

{¶ 43} Accordingly, recovery is not limited to diminution in value. Where appropriate, restoration costs may be recovered. We note that *Martin* has been applied subsequently to situations involving trespass and temporary injury to property. *See Hartman v. Ohio Dept. of Transp.*, 10th Dist. Franklin No. 08AP-599, 2009-Ohio-469. *Hartman* involved trespass and improper mowing of the plaintiff's hedgerow. *Id.* at ¶ 5. The court of appeals noted that after *Martin*, "diminution in value is a factor that may be considered in determining whether restoration costs are reasonable, but is not itself an element of damages that must be considered." *Id.* at ¶ 7. Thus, to the extent that the trial court's decision was based on allowance of reasonable costs, it is not inconsistent with current law.

{¶ 44} *Martin* involved defects in a home, and the Supreme Court of Ohio did not comment on matters like distinctions between ornamental trees and a woodland mix, whether trees are part of personal planning for the land use, and whether trees have a calculable value apart from the land. However, because *Martin* establishes a general rule of reasonableness, these factors should be considered in deciding whether a decision on damages is reasonable.

{¶ 45} Viewing the trial court's award of damages from the perspective of reasonableness, we must conclude that the award for restoration was objectively unreasonable. Phrased another way, the trial court's decision was against the manifest weight of the evidence.

{¶ 46} "[I]n order for an appellate court to reverse a decision as against the manifest weight of the evidence in a civil context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly

lost its way and created a manifest miscarriage of justice." *Alh Properties, P.L.L.*, 9th Dist. Summit No. 20991, 2002-Ohio-4246, at ¶ 12. Although reversal for manifest weight is reserved for rare situations, we conclude that the circumstances of this case warrant application of the doctrine. *Compare Broadstone v. Quillen*, 162 Ohio App.3d 632, 2005-Ohio-4278, 834 N.E.2d 424, ¶ 22 (10th Dist.) (reversing an award of damages where it was not clear how the trial court arrived at a figure granted for permanent impairment to earning capacity).

{¶ 47} In *Tinney v. Tite*, 6th Dist. Huron No. H-11-006, 2012-Ohio-2347, the court of appeals observed that "[t]he case law implicating R.C. 901.51 almost exclusively involves situations where trees have been completely cut down, making it considerably easier to determine the full extent of the damage to the plaintiffs' property." *Id.* at ¶ 11. Like the present case, *Tinney* involved a tree that was not cut down, but sustained some injury due to the actions of the defendant. The trial court concluded that the damages were temporary and speculative because the tree appeared to be thriving nearly one year later. *Id.* at ¶ 13. However, the court of appeals found that this decision was against the manifest weight of the evidence, and that the trial court could have awarded at least nominal damages because "the damages to the tree must have had some value." *Id.* at ¶ 17.

{¶ 48} We agree with the assessment of the Sixth District Court of Appeals. Our research has also revealed that the cases generally involve situations in which defendants enter property and cut down numerous trees, rather than where trees simply sustain some sort of injury. *See, e.g., Jones*, 2d Dist. Greene No. 94-CA-49, 1994 WL 702062, at *1 (90 redbud trees on residential property were cut down); *Denoyer*, 22 Ohio

App.3d at 137, 490 N.E.2d 615 (68 trees were cut down and 331 trees were destroyed on residential property).

{¶ 49} In contrast to these cases, Brewer testified that other than a few small saplings, he was not claiming that any large trees had been removed from the property. Transcript of Proceedings, Vol. I, p. 203. Instead, his contention was that 326 trees had been damaged in some manner and would ultimately die, even though pictures of the area taken in June 2014 depict a substantial canopy of foliage. *See, e.g.*, Defense Ex. D1-14. Brewer also testified that a number of trees had died, but he did not give any specific number.

{¶ 50} Furthermore, unlike the situation in *Jones*, the trees were not ornamental and were not located at Brewer's residence. Instead, they were native trees that were part of a fence row on farmland. Brewer indicated that he uses his property for hunting only about a half-dozen times a year, and for family get-togethers, which occur twice a year. He also said the removal of branches had not impacted his hunting, his family get-togethers, or his ability to rent tillable land to farmers. Brewer did state that he intended to put a house on the property when his youngest child, who was then four years old, graduates from high school. However, he did not assert that the removal of the trees interfered with his anticipated use of the property for a home site.

{¶ 51} In this regard, the case before us is similar to *Dotson v. Village Res. Dev. Co.*, 9th Dist. Lorain No. 98CA007066, 1999 WL 494068, *1 (July 14, 1999). Like Brewer, the plaintiffs in *Dotson* did not contend that the damaged part of the property was essential to their purchase for use of a home site. According to the court, the plaintiffs "established, at most, that they walk around back there." *Id.* at *4.

**{¶ 52}** In *Dotson*, the court of appeals also noted that the restoration estimate was worth more than the plaintiffs had paid for the parcel almost two years earlier, and that only a small portion of the property had been damaged. *Id.* As a result, the court of appeals concluded that the cost of restoration was "grossly disproportionate." *Id.* This is similar to the case before us. Brewer paid $180,000 for the land several years before the incident, and the alleged restoration cost (including removal and replanting of trees) for a very small proportion of the property was more than $200,000.

**{¶ 53}** We understand that the trial court did not award the entire amount of the requested damages. However, the basis for the trial court's decision is hard to decipher. As was noted, Brewer did not testify as to any diminution in value. Although Brewer was not required to present such evidence, it would have been helpful, particularly since two defense witnesses indicated that removing vegetation from the fence row did not impact the fair market value of the land. Although the trial court concluded that Dr. Sydnor was not credible on this particular point, the court made no comment about the other evidence of lack of diminution. In addition, the damages award, even before it was trebled, was many thousands times higher than the zero change in value, which was not contradicted. This is akin, as noted in *Jones*, to spending $100,000 to restore a car with a $10,000 fair market value, i.e., it was objectively unreasonable.

**{¶ 54}** As a further matter, other parts of the trial court's calculation were based on speculation or were incorrect. For example, the court concluded that one-fourth of the fence row was trimmed negligently. However, the figure the court used (negligent trimming of 1,000 feet out of a total of 3,600 feet), is actually 27.77%, not 25%. April 6, 2015 Decision and Entry, p. 15.

{¶ 55} The court also did not explain the basis for its adoption of the 1,000 foot figure. Brewer's own testimony was that half the fence row had been trimmed when he arrived at the scene. This would have been 1,800 feet. Transcript of Proceedings, Vol. I, p. 185. In contrast, Hawkey, who was trimming, testified that he was almost finished with Brewer's property when Brewer told him to stop. The figure of 1,000 feet came from Deputy Nichols, who stated that this was an estimate, as he did not measure the property. The trial court could have chosen to disregard Hawkey's testimony, but there is no logical reason to disregard the plaintiff's own admission about how far the fence row had been cleared. In any event, the trial court gave no reason for disregarding Brewer's testimony.

{¶ 56} Finally, the court gave no particular reason for its 50% discount on damages. As has been noted, the trees on the fence row were a woodland mix of native trees, not ornamental trees. A number of the trees were undesirable, and there was no evidence of special value. In addition, the fence row had been unmaintained for ten or twenty years. Even though these facts no longer require damages to be limited to diminution in value, they are still points that should be considered in deciding whether an award is reasonable.

{¶ 57} Finally, we note that the trial court's decision refers to a number of matters that are simply not in the record, like the fact that DLF "is widely known to be a very large and successful farming operation in many counties in this vicinity. Its only or controlling shareholder is Dick Lavy." April 6, 2015 Decision and Entry, p. 2.

{¶ 58} Based on the preceding discussion, the Second Assignment of Error is sustained. On remand, the trial court is instructed to hold a new hearing on damages. On remand, the trial court shall consider the reasonable restoration costs, taking into

consideration the following factors: (1) any evidence about diminution in the fair market value of the land; (2) the fact that the trees were a common woodland mix, not ornamental trees or trees that the plaintiff had planted for a particular purpose; (3) the fact that the fence row was not maintained for many years, and had undesirable and dead trees on each side of the row; (4) the extent to which the trees have regenerated since January 18, 2013; (5) the lack of impact on plaintiff's intended home site, given that the land on either side of the fence row belongs to other individuals and the lane only leads back to a potential home site; (6) the fact that plaintiff's use of the property for recreation is very sporadic and is not impacted by any injury to the trees. As noted in *Tinney*, 6th Dist. Huron No. H-11-006, 2012-Ohio-2347, at ¶ 17, the damage to the trees had some value, even if nominal.

## IV. Negligent Trespass

**{¶ 59}** DLF's Third Assignment of Error states that:

The Trial Court Erred as a Matter of Law to the Prejudice of DLF When It Held Appellant Negligently Trespassed on Appellee's Property; in the Alternative, the Court's Holding Was Against the Manifest Weight of the Evidence.

**{¶ 60}** Under this assignment of error, DLF contends, first, that the trial court erred in finding it negligent. Specifically, DLF maintains that the trial court required it to use the best method of trimming vegetation, rather than applying a traditional negligence analysis. Alternatively, DLF contends that the court's decision is against the manifest weight of the evidence.

{¶ 61} In the complaint, Brewer asserted claims for violation of R.C. 901.51, negligent trespass, and reckless trespass. "A common-law tort in trespass upon real property occurs when a person, without authority or privilege, physically invades or unlawfully enters the private premises of another whereby damages directly ensue, even though such damages may be insignificant." *Linley v. DeMoss*, 83 Ohio App.3d 594, 598, 615 N.E.2d 631 (10th Dist.1992). "The act of nonconsensual entry may be intentional or negligent." *Id.* "In order to recover compensatory damages for trespass, it must be shown that the trespass proximately caused harm for which the compensation is sought, and the amount of damage must be proved by a preponderance of the evidence." (Citation omitted.) *Pleasant Hill-Newton Tp. Fire Assn., Inc. v. Adams*, 2d Dist. Miami No. 85-CA-40, 1987 WL 11043, *5 (May 13, 1987).

{¶ 62} This case presents a somewhat unusual situation, because DLF's employee, Hawkey, did not actually trespass on Brewer's land, other than when clearing off brush that had fallen or during a few instances in which he was unable to control the bucket of the track hoe. Transcript of Proceedings, Vol. I, p. 102. In fact, Hawkey stated that he never consciously reached over onto Brewer's property to snap off a branch at the tree trunk that was on Brewer's property. *Id.* at p. 106. The action of clearing debris would not have harmed Brewer, but would actually have been of benefit. In addition, Hawkey only identified one instance where he was unable to control the bucket. *Id.* at p. 116, identifying Plaintiff's Ex. 1-13.

{¶ 63} As was noted, most instances of trespass occur when individuals enter onto the land of another, cut down, and remove trees. *See, e.g., Shanklin v. Lowman*, 3d Dist. Logan No. 8-10-07, 2011-Ohio-255, ¶ 2. Nonetheless, trespasses can occur if

individuals set in motion actions that intrude on another's land and cause damage. *See, e.g., Brown v. Scioto Cty. Bd. of Commrs.*, 87 Ohio App.3d 704, 709, 622 N.E.2d 1153 (4th Dist.1993) (indicating that recovery for trespass can occur, for example, if a polluting substance is deposited on a party's land and interferes with the party's possessory interest by causing damage). Thus, liability could still exist even if Hawkey did not actually enter Brewer's property.

**{¶ 64}** The trial court concluded that DLF was negligent by failing to cut or break the trees above its own land, and that DLF breached a duty to ensure that no damage occurred on Brewer's side of the property line. In its findings of fact, the court discussed two methods of trimming trees (using a track hoe to tear limbs along fences and using a bucket and chain saw). The court then held that "the more common but dangerous method of lifting a person in the from [sic] of a scoop bucket on a tractor * * * more clearly respects the property line and causes the lest [sic] damage." April 6, 2015 Decision and Entry, p. 6.

**{¶ 65}** To establish actionable negligence, the party "seeking recovery must show the existence of a duty, the breach of the duty, and injury resulting proximately therefrom." *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285, 423 N.E.2d 467 (1981).

**{¶ 66}** Various testimony was presented at trial about practices in Darke County, Ohio, for cutting limbs. Brewer's expert, Furlong, stated that the common practice is to use a chain saw, hand saw, or poll pruner. Furlong also said he had never seen anyone use a track hoe, which will cause more damage to a tree. Furlong estimated the cost of his type of pruning to be about $16,000 for the length of the fence row. It is evident from the testimony that this type of pruning would be a difficult expense for most farmers; none

of the farmers who testified indicated that they would use this form of trimming.

{¶ 67} Both Hawkey and a farming expert for DLF stated that the custom in Darke County is to clear fences using a track hoe or back hoe. DLF's expert, Barry Rodeheffer, stated that he had been farming in the county for 45 years, and that the common practice for clearing fence rows for the last 15 years had been to use back hoes or track hoes to tear limbs off overhanging trees. Rodeheffer also named commercial excavating companies who use this method. In addition, Rodeheffer said that using a bucket truck and chain saw is not standard practice because of cost and labor. Furthermore, this method is not used because it is dangerous.

{¶ 68} Another farmer in Darke County, Joe Henry, testified on rebuttal that the farmers he knows stand in a loader bucket and trim trees using a chain saw. Henry indicated that this is a very dangerous method for farmers to use, as it is not safe. In addition, Henry testified that he did not know anyone who used a track hoe for trimming. Finally, Dr. Sydnor stated that he would not recommend pruning with a track hoe.

{¶ 69} In view of the above testimony, we cannot say the trial court erred in concluding that DLF's employee was negligent. Farmers may face difficult choices if the available methods are either too expensive, or risk damage to surrounding property, or risk the farmer's safety. However, the issue in this case is simply whether the method in question caused unnecessary harm to the adjoining property. In view of the evidence, we cannot conclude that the trial court erred in the standard it applied, nor can we conclude that the court's finding of negligence was against the manifest weight of the evidence.

{¶ 70} Accordingly, the Third Assignment of Error is overruled.

## V. Recklessness

{¶ 71} DLF's Fourth Assignment of Error states that:

The Trial Court Erred to the Prejudice of DLF because Its Finding that Appellant Was Reckless Was Against the Manifest Weight of the Evidence.

{¶ 72} Under this assignment of error, DLF contends that the trial court's finding of recklessness was against the manifest weight of the evidence. According to DLF, the trial court improperly discounted DLF's common law privilege and also ignored testimony, including the fact that Dick Lavy offered to let Brewer trim his own trees over the two or three-month period before spring planting.

{¶ 73} We noted earlier that the Supreme Court of Ohio has adopted the definition of recklessness in R.C. 2901.22(C) for purposes of assessing liability under R.C. 901.51. *Wooten*, 79 Ohio St.3d at 289-90, 680 N.E.2d 1245. R.C. 2901.22(C) provides that:

A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

{¶ 74} After reviewing the record, we cannot conclude that the finding of recklessness was against the manifest weight of the evidence. Dick Lavy testified that

Deputy Nichols told him that Brewer was not happy with what was happening, and asked him to stop clearing the line until he got legal advice. There was no indication that Lavy did so before continuing to clear the line. Furthermore, although Lavy stated that Brewer was welcome to trim the trees on his own, Lavy did not tell his employee to stop clearing the line in order to give Brewer a chance to do so. He also did not contact Brewer to discuss the matter. Notably, there was no specific reason to proceed immediately. Lavy told Deputy Nichols that he wanted to clear the fence row before spring planting. However, planting would not occur for two or three months.

{¶ 75} Courts have found defendants reckless in various situations where their actions continued after they learned of a dispute about the activity. *See, e.g., Miller v. Jordan*, 87 Ohio App.3d 819, 824, 623 N.E.2d 219 (12th Dist.1993) (defendant continued cutting timber after being told he was cutting trees belonging to neighboring property owner), and *Johnson v. Hershberger*, 7th Dist. Columbiana No. 99-CO-38, 2000 WL 1486758 (Sept. 29, 2000) (defendant acted recklessly by continuing to cut trees after being warned of a dispute over location of property line).

{¶ 76} Accordingly, the Fourth Assignment of Error is overruled.

## VI. Conclusion

{¶ 77} DLF's First, Third, and Fourth Assignments of Error having been overruled, and DLF's Second Assignment of Error having been sustained, the judgment of the trial court is affirmed in part and reversed in part. The judgment of liability is affirmed, and the judgment as to damages is reversed. This cause, therefore, is remanded for a new hearing on damages.

. . . . . . . . . . . .

DONOVAN, P.J., concurs.

HALL, J., concurring:

{¶ 78} I agree with the resolution detailed in the lead opinion. I write separately to emphasize my belief that there is no duty of reasonable care required by a property owner when protecting her own property from encroaching vegetation. She may cut, mutilate, decimate, pulverize or obliterate branches or roots which infringe upon her property from a neighbor's trees or plants.[4] Self-help is permitted to remove trees or plants. What she cannot do is intrude into the neighbor's property in doing so. That is why liability is imposed here. Tearing off branches on the DLF property which extended into the Brewer property and which severed the branches at the trunk, or some other point on the Brewer property, constituted an intrusion and the trespass across the property line into the Brewer property, regardless of any degree of care or lack thereof.

{¶ 79} The quote from *Newport Harbor Assn. v. DiCello*, 8th Dist. Cuyahoga No. 87126, 2006-Ohio-4493 to the effect that "it is a well-recognized principle of common law that a landowner has the right to protect his own land from threatened injury, even though, in doing so, he produces a condition that injures adjoining land, *provided he acts with reasonable care,*" *id.* at ¶ 29, is, in my view, not a correct statement of the law applicable to removal of encroaching vegetation. In *Newport*, DiCello bought a boat slip represented

---

[4] It seems likely that a landowner could not chemically treat or poison the roots or limbs that encroach upon her property if that method of destruction will migrate to that portion of the vegetation on the neighbor's yard and destroy the tree or shrub altogether, but that is an issue for another day.

to be 80' by 25'. His 63' by 15' boat fit. Years later, when he had custom-made an 80' by 20' yacht, he had difficulty docking it. He measured the width of his slip from the finger dock walkway on one side to the guide poles that separated his slip from the next one. The distance measured 23'. Newport Harbor would not move the poles. The owner of the adjacent slip also objected. DiCello hired an underwater demolition crew who cut down the guide poles at 5:00 a.m. one morning. Litigation ensued. The question before the Court of Appeals was whether the trial court erred by granting Newport Harbor's motion for summary judgment on its claim for purposeful and malicious destruction of property. The court of appeals concluded that "DiCello presented sufficient evidence to allow the issue of purposeful and malicious destruction of the guide posts to go to the jury." *Newport Harbor* at ¶ 20. The question the case turned on was not whether the poles constituted a trespass on DiCello's boat slip, but on whether the removal of poles that he may have reasonably believed encroached on his property constituted "purposeful and malicious destruction." The court concluded a "question of fact exists regarding DiCello's state of mind," *id.* at ¶30, when he had the poles cut down.

{¶ 80} I also draw a distinction between removal of encroaching vegetation, where self-help is universally accepted, and removal of structures, building or fences, where self-help is often unacceptable. Accordingly, I am of the opinion that the reasonableness evaluation from the *Newport* quote does not apply to the removal of vegetation but because of the trespass, the result is the same nonetheless.

. . . . . . . . . . . .

Copies mailed to:

Jose M. Lopez
Edward J. Dowd
Kevin A. Lantz
Hon. Jonathan P. Hein