[Cite as *Hoffs v. Batman*, 2017-Ohio-9309.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**GREENE COUNTY**

REBECCA HOFFS :
:
    Plaintiff-Appellant/ : C.A. CASE NO.   2017-CA-5
    Cross-Appellee :
: T.C. NO. CVE-1300041
v. :
: (Civil Appeal from
JOE BATMAN :  Municipal Court)
:
    Defendant-Appellee/ :
    Cross-Appellant :
:
:
     . . . . . . . . . . .

**O P I N I O N**

Rendered on the 29th day of December, 2017.

     . . . . . . . . . . .

RICHARD A. BOUCHER, Atty. Reg. No. 0033614 and JULIA C. KOLBER, Atty. Reg. No. 0078855, 12 W. Monument Avenue, Suite 200, Dayton, Ohio 45402
     Attorneys for Plaintiff-Appellant/Cross-Appellee

NOEL K. McKEOWN, Atty. Reg. No. 0018739 and CHRIST THEODOR, Atty. Reg. No. 0020042, 20 King Avenue, Xenia, Ohio 45385
     Attorneys for Defendant-Appellee/Cross-Appellant

     . . . . . . . . . . . . .

DONOVAN, J.

    **{¶ 1}** This matter is before the Court on the Notice of Appeal of Rebecca Hoffs,

filed January 23, 2017, and the Notice of Cross Appeal of Joe Batman, filed January 27,

2017. Hoffs and Batman appeal from the trial court's December 29, 2016 "Judgment Order and Entry" that, on Batman's objections, overruled in part and affirmed in part the Magistrate's decision in favor of Hoffs on her claims against adjacent neighbor Batman based upon damage to landscaping at her home caused by his application of Roundup. The Magistrate concluded that Batman acted recklessly in applying the Roundup and awarded treble damages in the amount of $11,989.35. The trial court vacated the award of treble damages and granted judgment in favor of Hoffs in the amount of $3,996.45, with interest at a rate of 3% per annum, until paid in full. We hereby conclude that Hoffs is entitled to treble damages based upon Batman's reckless application of Roundup and vacate the judgment of the trial court on Batman's objections. The judgment of the trial court is reversed and remanded for proceedings consistent with this opinion.

{¶ 2} Fred and Rebecca Hoffs filed a complaint against Batman on January 10, 2013, alleging that Batman sprayed the bushes located at the Hoffs' property at 4902 Appaloosa Trail in Fairborn "with a pesticide, herbicide, or other vegetation killer," causing "injury and destruction to the vines, bushes, trees, and other vegetation standing or growing on the Property." The Hoffs further alleged that they "served a written demand, by certified mail, return receipt requested, upon Defendant conforming with the requirements of Ohio Revised Code §2307.61," and that Batman "is liable pursuant to O.R.C. § 2307.60 et seq., in an amount exceeding $12,000.00, including actual and compensatory damages, statutory damages, punitive damages, and reasonable attorney's fees." The Hoffs asserted that Batman trespassed upon their property causing damage in the amount of $3,900.00, and they sought treble damages pursuant to R.C. 901.51. Finally, the Hoffs alleged a claim for punitive damages.

{¶ 3} Batman filed an answer and counterclaim on February 12, 2013. In his counterclaim, Batman sought attorney fees, the cost of defending the action, and any compensatory damages in the event that he prevails in defending the action, pursuant to R.C. 2307.61(B). Batman requested that the complaint be dismissed and further requested dismissal as against Fred Hoffs, an improper party. Attached to the answer is a quit-claim deed from Fred Hoffs to Rebecca Hoffs for property located at 4902 Appaloosa Trail. On February 25, 2013, the Hoffs filed a "Reply" to the counterclaim. With leave of court, Rebecca Hoffs filed an amended complaint that does not include Fred Hoffs as a party, and that adds a claim of negligence, and Batman filed an answer thereto on October 4, 2013. Batman's subsequent answer does not include a counterclaim.

{¶ 4} The trial before the Magistrate was held March 21, 2014 and May 23, 2014. Earl Liming testified that he is employed at the Ohio Department of Agriculture ("ODA") as a pesticide and fertilizer inspector. He stated that his office received a complaint from Rebecca Hoffs "regarding some potential pesticide, herbicide damage to her property" on Appaloosa Trail. He stated that he visited the property and interviewed Hoffs and Batman. Liming identified a September 28, 2012 "Notice of Warning" sent from the Agriculture Inspection Manager at the ODA to Batman, based upon Liming's investigation, which provides: "The [ODA] investigated a complaint concerning your pesticide application activities in July. As a result of our investigation, ODA determined that your pesticide application caused damage to an adjacent property," and that "[d]amage patterns compel ODA to conclude that your mid-May Roundup application caused damage to the Hoffs [sic] property. This is a violation of the Ohio Pesticide Law."

{¶ 5} Liming identified his Case Investigation Report, which provides in part:

**Statement from Applicator**: On 7/24/12, I interviewed Joe Batman concerning this complaint. * * *

Mr. Batman issued a statement * * * early to mid-May he did spray the fence row weeds around the alfalfa field. Mr. Batman stated he was spraying his side of the fence at the bottom and apologizes for any damage anyone may have incurred from this application because it was unintentional. Mr. Batman stated he used a four gallon back pack sprayer with Round-Up at the rate of 3oz per gallon of water

Mr. Batman stated his fence row is clean except for the portion of the complainant who has refused to work with anyone o[n] controlling their overgrowth into his fence.

{¶ 6} Liming identified 17 photographs in his report taken by him at Hoffs' property depicting large dead bushes and turf along the fence line. He stated that the photographs depicted "pesticide damage." Liming testified that he also photographed six photographs that were initially taken by Rebecca Hoffs of damaged bushes along the fence line, and that the images therein were consistent with his photographs. Liming testified that Hoffs' landscaping and maintenance of the property was otherwise "meticulous."

{¶ 7} On cross-examination, Liming stated that the damaged shrubbery and turf ran along the property line and was within two or three feet from the fence. He stated that "Roundup is a contact killer, it's a vegetation killer, basically once Roundup is applied to an area, whether it['s] plants or turf grass or unwanted weeds, it will kill them." Liming stated that the active ingredient in Roundup is "glyphosate," and that it is a very common

active ingredient in multiple weed control products such as Roundup Quickpro, Eraser, and Killzall. He further stated that there are numerous other products containing different active ingredients that would cause the same type of damage as Roundup. Liming testified that he collected a sample from Hoffs' property from a damaged forsythia bush, and that the sample was not analyzed.

{¶ 8} Liming identified the written statement that he took from Batman, which provides:

I, Joe Batman, I believe in mid May of 2012 [sic]. I did not intentionally spray more than the bottom of the fence row. My intentions were to control the weeds and other noxious growths that were damaging my fence that was my only intent! Any other spraying was not intentional.

My fence row is clean except for the portion of the complaint [sic] who has refused to work with anyone on controlling their overgrowth.

The product used was [R]oundup at suggested amounts. This spraying was done with a back pack sprayer at 3 oz. per gallon.

{¶ 9} On re-direct examination, Liming stated that Hoffs advised him that she also filed a complaint with the Greene County Sheriff's Office about the damage to her landscaping, and that she provided him with the handwritten statement she submitted to the sheriff's office, which provides: "We've been out of state since December 2011. When we returned the fence line had been sprayed with Round Up damaging the bushes. At this time we wish to have this documented and not press charges." Liming testified that he did not test the forsythia sample he obtained from the Hoffs' property based upon Batman's admission to using Roundup in mid-May. Liming stated that by law the use of

Round Up must be consistent with the instructions on the product's label, and that the applicator, namely the person applying the product, determines where the product is applied. On re-cross-examination, Liming stated that at the time the "Notice of Warning" was issued to Batman, he was unaware of any applications of other products by Buckeye EcoCare on the property, and that he did not investigate such applications.

{¶ 10} David Young next testified that Schauer Landscaping is his family owned business of 30 years, and that he provided an estimate to repair the damage on Hoffs' property. He testified that Roundup "will kill anything that it touches, turf or plants or trees, it's systemic." He stated that insects could cause similar damage, but that he did not observe signs indicative of the presence of insects on Hoffs' property. Young identified the estimate he provided to Hoffs on August 8, 2012, "for replacing the shrubs along the fence," in the amount of $3,996.45. He stated that when he arrived at Hoffs' property, the "shrubs were all dead, the whole hedge was dead, obviously, in my opinion it was from a chemical spray." Young stated that he also observed damage to turf in the area consistent with chemical spray. According to Young, the damage he observed was to mature shrubbery of approximately "twenty plus years" of age. Young stated that his estimate covered the removal of 13 dead bushes, including the root systems, installation of top soil and replacement of seven arrowhead viburnum, four forsythia, one weigela, and one common lilac. Young stated that "we can't replace the actual size of the plants, they're just not available to us, so these are the biggest ones I can get that come close to matching what he had." Young stated that Hoffs "had an existing mature hedge." He described the landscaping on Hoffs' property as "manicured."

{¶ 11} On cross-examination, Young testified that he does not know which

herbicide caused the damage to Hoffs' property, when it was applied, or by whom. Young stated that draught could cause vegetation to die, and in that event, "you would have other shrubs in the yard die, but this was just one single row." He stated that the replacement bushes would be four to five feet tall.

{¶ 12} Rebecca Hoffs testified that she has lived at the Appaloosa Trail address for almost 26 years, and that she and Batman have been adjoining neighbors since she and her husband purchased the property. She stated that she contacted the Greene County Sheriff's Office in May of 2012 when she returned home from out of state and observed the damage to her property. She stated that at that time, "being May, things were blooming and green and these particular bushes had no leaves, had no flowers, had nothing, and so we started to investigate and it looked like that had been damaged and we weren't sure how so we called the sheriff just to report it because we were concerned that it could be, possibly, a neighbor dispute," based upon past events with Batman.

{¶ 13} Hoffs testified that she suggested to Liming that Batman may have been responsible for the damage because "[w]e've had disputes for quite a few years," going back to 1988. She stated that the first time she met Batman, she was mowing her lawn. He accused her husband of throwing rocks over the fence line onto his property while her husband was mowing the lawn. Hoffs stated that she advised Batman that was not possible because she, not her husband, did all the mowing. She stated that in 1992, she observed Batman "leaning over the fence with his weedwacker [sic] and he had cut one of my plants and so I went out and had a confrontation and he said he didn't do it and I said I saw you do it and we kind of left it at that." Hoffs testified that a day or so later, Batman came onto their side of the fence to trim and removed more of her flowers, and

that her husband told him to get off their property and "stay away from my wife's flowers, and we thought that was it and then the sheriff appeared probably an hour later [and said] that Mr. Batman had called and filed a report against my husband."

{¶ 14} Hoffs stated that in 2004 an issue arose with Batman when he "had been trimming some of our bushes, which is fine, anything that goes over the fence belongs to him and he can trim it, but he was throwing it back over." Hoffs testified that after speaking with their attorney about the incident, she and her husband asked Batman to remove the material and "Mr. Batman gave us the finger * * * of which my husband took a picture of it and basically said here's what you can tell your lawyer and continued to just throw it back over the fence." She identified the photograph taken by her husband of Batman making the gesture.

{¶ 15} Hoffs stated that in 2007, she observed Batman and another person "spraying what he was calling herbicide along the fence line and I went out and voiced my concern for my pine trees." According to Hoffs, "within a year that particular pine tree was dead, so I took pictures of it and got estimates to replace it and to have it removed and sent Mr. Batman a letter and told him that his spraying had caused the death of my pine tree and I got no reaction." She identified a copy of the March 27, 2008 letter that she sent to Batman, as well as an estimate from Paul's Tree Service to remove the dead tree for $175.00, an estimate from Siebenthaler's Nursery to replace a White Pine for $1,001.90, and a photograph of the healthy tree in 2007. She stated that the tree was 25-30 feet tall when it died.

{¶ 16} Hoffs testified that in July of 2010, "the Road Department from Bath Township arrived in our driveway and said that they had received a complaint from Mr.

Batman concerning a weed patch, that we were not maintaining our yard and they wanted to investigate." Hoffs testified that the area is in fact her perennial garden. She stated that nothing resulted from Batman's complaint. Hoffs described Batman's personality as combative.

{¶ 17} Hoffs testified that she advised the sheriff, regarding the instant incident, that she did not want to press charges because she and her husband had learned that Batman was ill. She stated that at that time, she did not know that Batman had admitted to spraying Roundup in the area because she had not yet received the report from the ODA. Hoffs testified that her former attorney sent Batman a registered letter requesting that he pay for the damage to her property and that Batman returned the letter to the post office. She testified that she obtained an additional estimate from Siebenthaler's, and that the difference in price between the Siebenthaler's and the Schauer estimates is due to the fact that Siebenthaler's could only obtain bushes that were two to three feet in height.

{¶ 18} On cross-examination, Hoffs stated that the fence between her and Batman's property is on his property by four or five inches from the property line, and that it is four feet tall and topped with barbed wire. She stated that the Siebenthaler's estimate was almost half of the amount estimated by Schauer. Hoffs testified that she has used Buckeye EcoCare since before 2012 to care for her lawn. She testified that they "just spray the yard in the spring and fall," and that she was out of town when they did so. She testified that Buckeye EcoCare sprayed for weeds sometime before she came home in May of 2012. On re-direct examination, Hoffs stated that she has never experienced any dead vegetation as a result of work done by Buckeye EcoCare.

{¶ 19} Counsel for Hoffs next called Joe Batman as on cross-examination.

Batman testified that he received the "Notice of Warning" from the ODA, and that he disputes the findings. After reading his July 24, 2012 written statement to the ODA, Batman testified that he "did not spray the fence. I sprayed the bottom of the fence, that's very clear in this statement." Batman testified that he has been using Roundup for 35-40 years, and that he understands the damage that it can cause if misused. He testified that the nature of the product "is why I use a hood, yes, sir."

{¶ 20} The following exchange occurred regarding the deposition of John Mantei, another of Batman's adjacent neighbors:

Q. * * * You were present during Mr. Mantei's deposition, correct?

A. Yes.

* * *

Q. * * * Isn't it true that in mid-May you went to Mr. Mantei after spraying Roundup and you told Mr. Mantei there is some dead grass in your area and I think I did that when I was spraying Roundup?

A. No, I never said. * * *

Q. Could you look * * * at Page 5, Line 20 - - actually, go up to Line 18 [of Mantei's deposition], do you see that?

A. Yeah.

Q. * * * And I believe it says, my question was at Line 18 speaking to Mr. Mantei, could you tell me how you recall it; Line 20, answer, Joe didn't have a backpack and when I was talking to Becky and Fred, there was a brown spot on my property and Joe had a day before or so told me that he had sprayed that spot. Do you recall that?

A.   No.

Q.   Now, we've submitted Mr. Mantei's testimony in the deposition form, so you don't dispute what Mr. Mantei is saying, do you?

A.   I'd say Mr. Mantei has as good a recollection as anyone.

{¶ 21} Batman acknowledged that he responded in part to Hoffs' interrogatories as follows: "11.   Please specify all the date(s) that you sprayed or otherwise applied a herbicide upon the property owned by one of the Plaintiffs.   ANSWER: I did not spray or apply herbicide to Plaintiff's property."   Batman testified that he only sprayed on his side of the fence.

{¶ 22} Batman then testified on direct examination that his fence is 51 inches tall. He stated that he has never leaned over the fence to trim because the "fence is set off of the ground at least four inches so it can be trimmed under."   He stated that he would not be able to lean over the fence with a trimmer.   He testified that his weed trimmer is an older model that weighs around 20 pounds and is "very heavy."

{¶ 23} The following exchange occurred:

Q.   Joe, I'm showing you what's been identified as Exhibit - -

MR. DECHANT:   Is it F or G?

THE COURT:   You are on G.

Q.   Do you recognize this, Joe?

A.   That is my back pack sprayer.

Q.   * * * And is this the backpack sprayer that you always use?

A.   Yes.

* * *

Q. So this is B, do you recognize this?

A. That's a spray wand, it is mine.

* * *

MR. DECHANT: This will be Defendant's Exhibit H, Your Honor.

* * *

THE COURT: * * * I don't know what to call that. * * * Mr. Batman, what do you call that?

THE WITNESS: That would be a spray protector for grass.

* * *

MR. BOUCHER: We're calling that a spray hood protector?

MR. DECHANT: Yes.

* * *

BY MR. DECHANT:

Q. And this is?

A. And that is also a spray hood protector, it keeps the spray localized only under the bottom.

Q. (Inaudible)

A. It attaches to the backpack spray.

THE COURT: And that was B?

MR. DECHANT: Yes.

Q. So are - - are these the equipment, Joe, you use when you spray along your fence line?

A. The bottom of the fence, yes.

{¶ 24} Batman demonstrated the assembly of the above exhibits, and the following exchange occurred:

Q. And can you demonstrate how you spray along the fence line?

A. Sure. We can pretend that the side of my shoes is the fence line, you turn the wand in and spray, and it, as you can see, directs the spray - - sprays the inside. I'd say there's approximately three inches - - (inaudible) - -

Q. Is there a particular height that you hold the wand?

A. Right on the grass, three inches, two and half, three inches. Actually, you should not lift it up - - (inaudible) - - which is the reason I use the hood to keep it located where it sprays where you want it to.

Q. Referring to the hood on Exhibit B, is that something you developed yourself?

A. Yes. There's a commercial hood available but it's larger.

MR. BOUCHER: Objection. That's beyond the scope of the question. I think his question is very specific.

BY MR. DECHANT:

Q. And just referring to the can, is that something you developed yourself?

A. Yes.

Q. And how long have you been using that?

A. I would say back in '80 somewhere.

Q. Okay.

A. No, I would say back in the '70s, probably '78, somewhere in that range I use it only on the property.

Q. And when you spray, you always spray in this manner?

A. Correct.

Q. You are only going along the top of the grass?

A. Correct.

Q. I'm going to show you what's been labeled Defendant's Exhibit H - -

* * *

Q. - - can you identify that exhibit, please?

A. That is a protector that I use for around fenceposts [sic].

Q. Can you demonstrate how you use it?

A. (Inaudible) - - you would set this down and spray inside that circle, and it would take care of the grass that you're trying to eliminate around the fenceposts [sic]

Q. * * * And how long have you been using Defendant's Exhibit H?

A. This goes back to the time frame, it could be earlier than that but I'm sure I was using it in '70.

Q. * * * Have you ever had to replace the can which is Defendant's Exhibit B?

A. Oh, yes. * * *

* * *

Q. And are other shields or flow restrictors commercially available?

A. Yes.

Q. And why didn't you use those?

A. They're larger, they're not as controlling as the unit that I have. They're quite a bit larger, probably three times larger.

Q. * * * So if I heard correctly, it's because this further restricts the flow?

A. That's correct.

{¶ 25} Batman testified that he demonstrated the use of Exhibits B and H to Glen Smith in the 1970s and that Smith uses the same items. Batman testified he always uses the items identified as exhibits when he sprays his fence line, and that he did so in May of 2012.

{¶ 26} On re-cross-examination, Batman testified that his fence is made of wire. He acknowledged the photograph of himself making the gesture with the fence a few feet before him, and he further acknowledged that in the photograph the fence line is lower than his elbow. He testified that he did not show Liming his spraying apparatus consisting of Exhibits B, G, and H.

{¶ 27} Glen Smith testified that he has known Batman since 1962, and he identified Exhibits B and G as "what Joe uses to - - to spray fences - - and this is for the post and that's for the regular fence." When asked if he ever used an attachment like Exhibit B, Smith responded, "I saw that on Joe's back porch in '87 and I asked him what it was, that was in the fall, and the following year I started using it because I live next to that medical center." On cross examination, Smith testified, "Every time I've been there and [Batman] was spraying, I saw him use that apparatus."

**{¶ 28}** The Magistrate, in ruling in favor of Hoffs, noted that the "Director of the ODA sent a written notice to Defendant in September 2012. This notice informed Defendant of the ODA finding and warned him that his action was a violation of Ohio pesticide law. There is no question that Defendant committed a trespass tort and is civilly liable for his actions." After noting that Hoffs obtained two estimates, and that Young's estimate took into consideration the mature size of the damaged vegetation, the Magistrate found that since "the purpose of compensatory damages is to put the injured party in the position she would have been in had the injury not occurred the higher estimate is reasonable." The Magistrate concluded as follows:

On direct examination, the Defendant testified that he was trying to be careful with his spraying technique and that he even used hand-made devices to limit the exposure of the chemical which he has been using for over 40 years. However, on cross examination Defendant was unable to remember details claiming that health issues limited his memory. There were no witnesses to Defendant's spraying in May 2012.

Defendant claimed that the Plaintiff's bushes and shrubs were encroaching on his fence but he did not provide any physical evidence of this. The Sheriff Deputy wrote in his report that Plaintiff's entire vegetation appeared to be a foot or more away from the Defendant's fence. In addition, Earl Leon Liming from ODA and David Anthony Young both testified that the bushes and shrubs were clearly only on the Plaintiff's property, which was well-maintained.

There has been a history of Defendant's disregard for other people's

property. Considerable evidence was introduced about Defendant's actions toward Plaintiff's property and toward neighbor John Mantei's property. During the May 2012 spraying, Defendant also killed a section of John Mantei's yard where the three properties meet.

In 1992, Defendant entered onto Plaintiff's property and trimmed Plaintiff's flowers. In 2004, Defendant was trimming his side of the fence and then throwing the debris onto the Plaintiff's property. He was also seen by a neighbor throwing pine cones over the fence onto Plaintiff's property. Another incident occurred in July of 2007, when Defendant sprayed herbicide at the fence line and killed a large white pine tree on Plaintiff's property. Plaintiff sent a written request for reimbursement which Defendant ignored.

Given this history, it is reasonable to conclude that in May 2012 Defendant acted in much the same manner. After weighing the evidence, applying reasonable inferences, and considering the credibility of witnesses, I conclude that Defendant disregarded a known risk with heedless indifference to the consequences of his actions during his May 2012 application of chemicals. A direct result of his reckless actions caused substantial damage to Plaintiff's property. Pursuant to statutory law, Defendant is liable for treble damages for the injury caused.

In addition, Plaintiff is requesting to recover attorney fees pursuant to R.C. 2307.60. At the beginning of the trial, it was agreed that this issue would be set for a separate hearing.

Therefore, the Magistrate recommends judgment against Defendant JOE BATMAN for treble damages, in the amount of $11,989.35 together with interest at the rate of 3% per annum from the date of judgment and costs.

**{¶ 29}** Batman filed initial objections to the Magistrate's decision on June 25, 2014, along with a motion to supplement his objections. Batman asserted that the Magistrate's decision was against the manifest weight of the evidence and not supported by sufficient evidence. He argued that the Magistrate "inappropriately relied on prejudicial and irrelevant evidence regarding past conduct that is unrelated to the facts of the current incident and was often based upon hearsay and unsupported self-serving testimony." Batman argued that the Magistrate erred in awarding damages of $3,996.45 and treble damages of $11,989.35. Batman asserted that the Magistrate "erred by ignoring evidence of alternative causation," citing Hoffs' use of a lawn service company. Batman argued that the Magistrate "erred by finding defendant intentionally damaged plaintiff's bushes." He argued that the Magistrate "misread or misconstrued the testimony via deposition of John Mantei." Finally, he argued that the Magistrate "abused her discretion by not allowing the admission of defendant's exhibits." On August 8, 2014, Batman supplemented his objections, further asserting that the Magistrate "erred by allowing improper opinion testimony by a non-expert," namely David Young from Schauer's.

**{¶ 30}** Hoffs responded to the objections on September 12, 2014, and Batman filed a reply to her response on October 9, 2014. In ruling upon Batman's objections, the trial court determined, regarding Liming's testimony, that the Magistrate "was able to evaluate the testimony of the witness by the usual tests of credibility and concluded that Mr.

Liming's testimony was credible and probative" of Hoffs' allegations that Batman's use of Roundup caused the damage to her bushes. The court noted that Young's testimony was consistent with Liming's. The court found that the Magistrate's decision that Batman's conduct damaged Hoffs' property is supported by the evidence and not against the manifest weight of the evidence.

{¶ 31} The court further found that "the Magistrate was in the best position to evaluate the credibility of the witnesses in this case, and chose to believe David Young as to the value of the loss to Plaintiff. The Magistrate applied an acceptable measure of damages to this claim, the costs of restoration, and Defendant presented no convincing reason why the Magistrate's decision" is in error.

{¶ 32} Regarding whether or not Batman acted recklessly in spraying Roundup, the court determined as follows:

> Plaintiff presented testimony that on a few occasions back to 1992, Defendant entered upon Plaintiff's land and caused damage to property, threw debris onto Plaintiff's property, and sprayed herbicide, causing damage to a tree on her property. Plaintiff presented the deposition testimony of John Mantei, who indicated that Defendant had sprayed his property with chemicals in 2012 causing damage to Mr. Mantei's property, which also abuts Defendant's property. However, the Court finds that Defendant did exercise some degree of caution and care in the present case by mixing the chemicals in the recommended proportions; using a limited volume spray applicator, and not entering upon the land of the Plaintiff, or otherwise acting in a manner that suggests that he intended to

cause the harm to Plaintiff's property that the Court has found did occur.

Based upon all the evidence in the record, the Court is of the opinion that the evidence is not sufficient to establish that in spraying the chemicals on a common fence line that Defendant acted recklessly, warranting an award of treble damages.

{¶ 33} Finally, regarding Batman's exhibits at trial, the court concluded that the "record reflects that Defendant's counsel did not offer the exhibits in a timely fashion, and did so only after having rested his case. In the opinion of the Court, the decision of the Magistrate is reasonable and consistent with Ohio law." The court granted judgment in favor of Hoffs "for the damages sustained," but declined "to award treble damages." The court vacated the award of treble damages. The court further concluded that since it found that Batman "did not act recklessly in causing the loss in this case, the Decision and Order of the Magistrate dated June 11, 2014 to schedule a hearing on the issue of attorney's fees is OVERRULED and VACATED."

{¶ 34} Hoffs asserts a single assignment of error herein, and Batman asserts two assignments of error. Because the assigned errors are interrelated, and all involve Batman's conduct, we will consider them together.

{¶ 35} Hoffs' assignment of error is as follows:

THE TRIAL COURT ERRED IN FINDING THAT APPELLEE DID NOT ACT RECKLESSLY AND SUBSEQUENTLY, THAT APPELLANT IS NOT ENTITLED TO TREBLE DAMAGES.

{¶ 36} Batman asserts the following two assignments of error:

THE TRIAL COURT ERRED IN FINDING THAT CROSS-

APPELLEE'S PLANTS AND BUSHES WERE WRONGFULLY DAMAGED BY CROSS-APPELLANT'S USE OF ROUNDUP HERBICIDE. CONSEQUENTLY, CROSS-APPELLEE IS NOT ENTITLED TO ANY DAMAGES OR ATTORNEY FEES.

And,

THE TRIAL COURT ERRED IN FINDING THAT CROSS-APPELLANT WRONGFULLY DAMAGED CROSS-APPELLEE'S PLANTS AND BUSHES. CONSEQUENTLY, CROSS-APPELLEE IS NOT ENTITLED TO ANY DAMAGES OR ATTORNEY FEES.

**{¶ 37}** According to Hoffs, there "was substantial evidence presented by Hoffs to prove that Batman's conduct was reckless under the circumstances." Hoffs asserts that the "trial court found that Batman did not act 'in a manner that suggests that he intended to cause the harm to [Hoffs'] property'. In making a finding based on *intent*, the trial court acted unreasonably. Intent is not an element of a reckless finding and to insert such a requirement is a misunderstanding of the law and is not reasonable." After noting that the trial court found that Batman exercised caution in mixing the chemicals in recommended proportions, Hoffs asserts that her "claims were not for reckless *mixing of chemicals*. They were for the reckless application of chemicals, whether mixed correctly or not is not relevant * * *." Hoffs asserts that "not only is the mixing of the chemicals not relevant, that finding by the trial court is not supported by *any* evidence in the record. There is no testimony as to Batman's mixing of the chemicals before he sprayed Hoffs' yard. In fact, on numerous occasions he testified that he did not remember the day in question."

{¶ 38} Regarding the trial court's determination that Batman exercised caution by using a "limited spray applicator," Hoffs asserts that Batman "never testified about 'a limited spray applicator' and he had no exhibits admitted that could have suggested the same. It is not reasonable for the trial court to make such a finding with no support in the record." Regarding the trial court's determination that Batman did not enter onto Hoffs' property, she asserts that there "was no need for him to do so to cause the destruction of the bushes. Whether or not Batman entered upon [Hoffs'] land might be relevant to the question of *intent,* which again, is not an element of a *reckless* finding." Hoffs notes that the bushes were accessible to Batman from his own property.

{¶ 39} Hoffs argues that she provided competent and credible testimony that "Batman had already been told that his previous application of RoundUp [sic] at the fence line had killed a pine tree on Hoffs['] property. Hoffs also testified that Batman had previously sprayed and killed vegetation on another neighbor's yard as well." She argues that the "notice alone of the misapplication of RoundUp [sic] on two occasions should have been sufficient for the trial court to affirm the Magistrate's Decision and make a finding of reckless behavior." Finally, Hoffs asserts that "Batman's 40 years of experience in spraying RoundUp [sic], coupled with *two* previous incidents of destruction to neighboring trees and vegetation alone, were more than enough to find that Batman knew exactly what precautions to take to avoid spraying on Hoffs' ornamental bushes."

{¶ 40} Batman responds that his fence is "located approximately three inches on his side of the parties' common boundary line," and that the trial court's finding that he and Hoffs " 'shared a common fence line' was inaccurate, but not a matter of significant consequence." Citing his written statement to Liming, Batman asserts that "it should be

obvious that Mr. Batman's expression of concern for Mrs. Hoffs' plant damage and contingent apology were basic acts of politeness and not an admission of personal misconduct, accidental or otherwise." He asserts that "inexplicably, no laboratory tests were performed by ODA to determine if Hoffs' plants had been damaged by Roundup or some other herbicide."

**{¶ 41}** Batman asserts as follows:

Appellee respectfully suggests that Judge Cappelli's choice of the term "limited volume spray applicator" may be somewhat confusing. Batman's testimony, confirmed by defense witness Glen Lee Smith is that when spraying herbicide Batman always used a back pack pressure sprayer and a self constructed "spray hood" for his applicator wand. He also used a separate "shield" device when spraying near or around fence posts. * * * The hood and shield constructed by Batman actually limited the herbicide spray to a smaller area of ground than would have been possible using a commercially available product. Batman also controlled the flow of chemicals from his spray wand by using a flow regulator control on the pressure sprayer. These devices in combination constitute the "limited volume spray applicator" referred to by Judge Cappelli in her decision.

Batman testified several times that he did <u>not</u> spray his fence or under his fence, or Hoffs' plantings. He sprayed only the ground near the fence and on his side of the fence. * * *

**{¶ 42}** Batman asserts that "it is clear that Judge Cappelli never used the word 'intent,' nor did she declare 'intent' to be an element of or test for 'reckless' as argued by

Hoffs." He asserts that instead, "Judge Cappelli used the word 'intending' with a reasonable expectation that it would be recognized as an incidental usage of a word or words by a Judge pronouncing an opinion that is not involved in the case or expected to set a legal precedent." Batman asserts that the trial court's use of "intending" is dictum, and that Hoffs' "attempt to misconstrue the plain usage of 'intending' is more of a red herring as it certainly does not constitute any basis to challenge Judge Cappelli's decision."

{¶ 43} In reply, Hoffs asserts that Batman misquoted the trial court's decision, and that the court's "use of the word 'intended' was not just haphazardly buried somewhere in the decision, but rather included in a conclusory paragraph summarizing Batman's behaviors regarding the RoundUp application. In making a finding based on *intent*, the trial court acted unreasonably." Hoffs asserts that Batman "**never** testified about a 'limited volume spray applicator' and he had no exhibits referencing such a thing. Batman would like this Court to believe that Judge Cappelli read some specific testimony and concluded that such a thing existed." According to Hoffs, Batman "never testified or presented any evidence that he utilized any particular device or apparatus on the date in question, [and] he actually admitted that he has no memory of the event. In fact, if he had used any safeguards that day, it stands to reason that the vegetation would not have been destroyed."

{¶ 44} Regarding his first assigned error, Batman argues that there is no "credible testimony, evidence or scientific proof that Roundup, a well[-]known herbicide that used Glyphosate * * * as its active ingredient, was the culpable herbicide that damaged Hoffs' plants and bushes." Citing Liming's testimony, he asserts that there "are far too many

causes of such damage that Plaintiff has failed to exclude." According to Batman, "without proving that Roundup, and not another herbicide, damaged her plants, there can be no causal connection to Mr. Batman who only admitted spraying Roundup."

{¶ 45} Batman argues that no "witnesses testifying under oath, no photographs, no exhibits, no evidence left behind at the scene prove or confirm that Mr. Batman sprayed anything in May of 2012 other than what he, himself, said he did." He argues that he "denied that he had ever sprayed Roundup onto his fence or onto Hoffs' land or onto her plants or bushes. No credible testimony or evidence presented by Plaintiff contradicts those statements." According to Batman, there "is no evidence in the trial record of excessive wind or other adverse weather condition that would have precluded Mr. Batman's spraying Roundup when he did. The record does contain ample testimony of the care taken by Mr. Batman when he mixed and used Roundup." According to Batman, that "Mrs. Hoffs and her husband were predisposed to blame Mr. Batman for their plant damages is quite apparent." He argues that upon their return home in May, Hoffs "immediately assigned the blame to Mr. Batman without any evidence or reason for doing so and notwithstanding their preceding five month absence when anyone could have accessed their property and damaged their plants." Batman argues that Hoffs presented no evidence of his misuse of Roundup.

{¶ 46} In response, Hoffs asserts that she "proved that it was RoundUp which caused the damage and second, the specific type of pesticide/herbicide is not what is critical but rather, that it was a pesticide/herbicide at all that killed the vegetation and not some natural phenomenon." Hoffs asserts that while Liming "noted that there are other pesticides/herbicides that contain similar ingredients to RoundUp that could cause similar

damage, * * * it was not his expert opinion in this case that those other herbicides were the culprit due to the fact that Batman admitted that he used RoundUp." Hoffs notes Young's testimony that her entire hedge was dead from a "chemical spray." Hoffs further notes that Batman admitted to spraying Roundup during the ODA investigation, and that he did not contest the findings at the time.

{¶ 47} Regarding Batman's second assignment of error, Hoffs asserts that Batman's property is the only property adjacent to hers at the area of damage, and asks, "does Batman expect this Court to believe that a trespasser entered on to his property to spray weeds on his fence line and kill Hoffs' vegetation?" Hoffs notes that Batman killed her pine tree and damaged Mantei's vegetation with Roundup. Finally, Hoffs argues that "[c]ritical here is that Hoffs only had to prove application and damages, not intent, in order to recover the costs of repair and replacement. And further, in order to be awarded treble damages, Hoffs only had to prove recklessness, not intent."

{¶ 48} In reply, Batman asserts that Liming's and Young's testimony "was thoroughly impeached under cross-examination" because numerous products can cause identical damage to that sustained by Hoffs. He argues that "[n]owhere, before Hoffs' response, does the record in this case contain any allegation by Hoffs that her plants and bushes were damaged by a chemical product other than Roundup. So why is Hoffs arguing now that identifying Roundup is not important?" According to Batman, "Roundup is the only causative link Hoffs had between Joe Batman and the plant damage suffered by her plants, and without that link Hoffs' entire case against Batman goes away." Batman asserts that if Hoffs "tries to allege plant damage by a product other than Roundup, she forfeits her causal connection to Batman, who admitted only to using

Roundup." According to Batman, absent "the sort of chemical testing that might have been possible from analyzing the damaged forsythia bush specimen removed by Leon Liming from Hoffs' property, it simply was not possible for either expert witness to determine what pesticide/herbicide product caused the damage."

{¶ 49} Batman argues that "Hoffs' testimony was designed to accuse Mr. Batman of a propensity to commit the sort of damaging acts that formed the basis of her 2012 complaint against him." He argues that "Hoffs' accusations were entirely self-serving and 'supported' only by police reports, letters and other complaints that she or her husband wrote." He "agrees that there have been disputes between his family and the Hoffs' family," and he argues that "the provocations were most definitely not one-sided," noting that over the course of 24 years "no civil cases were filed, no fines were assessed, no one was arrested, and no criminal charges were brought." Batman notes Hoffs' use of Buckeye EcoCare and argues that the company could have sprayed Hoffs' yard "and she would not have known about it." Batman asserts that "Hoffs had made no attempt to distinguish the alleged damage from Batman's spraying from the damage or effects caused by Buckeye EcoCare's undeniable spraying during the exact same time period." Batman asserts that he did not act recklessly. Finally, he argues that he "owned the fence, the ground that it was built on, and several inches of land beyond; so spraying the ground at or near the bottom of his fence was entirely lawful and proper assuming, of course, that he used a recommended mixture of Roundup chemicals and applied them carefully to avoid overspray."

{¶ 50} As this Court has previously noted:

Pursuant to Civ.R. 53(D)(3)(b), a party who disagrees with a

magistrate's proposed decision must file objections to said decision. Claims of trial court error must be based on the actions taken by the trial court, itself, rather than the magistrate's findings or proposed decision. When reviewing objections to a magistrate's decision, the trial court is not required to follow or accept the findings or recommendations of its magistrate. *Breece v. Breece,* 2d Dist. Darke No. 99–CA–1491, 1999 WL 999759 (Nov. 5, 1999); *Seagraves v. Seagraves,* 2d Dist. Montgomery Nos. 15047 and 15069, 1995 WL 559970 (Aug. 25, 1995). In accordance with Civ.R. 53, the trial court must conduct an independent review of the facts and conclusions contained in the magistrate's report and enter its own judgment. *Dayton v. Whiting,* 110 Ohio App.3d 115, 118, 673 N.E.2d 671 (2d Dist.1996). Thus, the trial court's standard of review of a magistrate's decision is de novo.

An "abuse of discretion" standard is the appellate standard of review. When an appellate court reviews a trial court's adoption of a magistrate's report for an abuse of discretion, such a determination will only be reversed where it appears that the trial court's actions were arbitrary or unreasonable. *Proctor v. Proctor,* 48 Ohio App.3d 55, 60–61, 548 N.E.2d 287 (3d Dist.1988). Presumptions of validity and deference to a trial court as an independent fact-finder are embodied in the abuse of discretion standard. *Whiting,* supra.

*Lewis v. Lewis*, 2d Dist. Greene No. 2013 CA 68, 2014-Ohio-958, ¶ 10-11.

{¶ 51} " 'Abuse of discretion' has been defined as an attitude that is unreasonable,

arbitrary, or unconscionable. *Huffman v. Hair Surgeon*[]*, Inc.,* 19 Ohio St.3d 83, 482 N.E.2d 1248 (1985). A decision is unreasonable if there is no sound reasoning process that would support that decision. *AAAA Enterprises, Inc.* [v.] *River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157, 553 N.E.2d 597 (1990)." *Feldmiller v. Feldmiller*, 2d Dist. Montgomery No. 24989, 2012-Ohio-4621, ¶ 7.

**{¶ 52}** R.C. 901.51 provides:

No person, without privilege to do so, shall recklessly cut down, destroy, girdle, or otherwise injure a vine, bush, shrub, sapling, tree, or crop standing or growing on the land of another or upon public land.

In addition to the penalty provided in section 901.99 of the Revised Code, whoever violates this section is liable in treble damages for the injury caused.

**{¶ 53}** In *Wooten v. Knisely*, 79 Ohio St.3d 282, 289, 680 N.E.2d 1245 (1997), the Ohio Supreme Court concluded that the term "recklessly" in R.C. 901.51 has the same meaning as set forth in R.C. 2901.22(C).   That statute provides as follows:

(C) A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

**{¶ 54}**  As this Court has previously noted:

Courts have found defendants reckless in various situations where their actions continued after they learned of a dispute about the activity. *See, e.g., Miller v. Jordan*, 87 Ohio App.3d 819, 824, 623 N.E.2d 219 (12th Dist. 1993) (defendant continued cutting timber after being told he was cutting trees belonging to neighboring property owner), and *Johnson v. Hershberger*, 7th Dist. Columbiana No. 99-CO-38, 2000 WL 1486758 (Sept. 29, 2000) (defendant acted recklessly by continuing to cut trees after being warned of a dispute over location of property line).

*Brewer v. Dick Lavy Farms, LLC*, 2016-Ohio-4577, 67 N.E.3d 196, ¶ 75 (2d Dist.).

{¶ 55} The separate concurring opinion in *Brewer* notes that "there is no duty of reasonable care required by a property owner when protecting her own property from encroaching vegetation. She may cut, mutilate, decimate, pulverize or obliterate branches or roots which infringe upon her property from a neighbor's trees or plants." *Brewer*, ¶ 78, Hall, J. concurring. We note that Footnote Four to the concurring opinion in *Brewer* further provides that it "seems likely that a landowner could not chemically treat or poison the roots or limbs that encroach upon her property if that method of destruction will migrate to that portion of the vegetation on the neighbor's yard and destroy the tree or shrub altogether, but that is an issue for another day."

{¶ 56} We conclude that the trial court properly determined that the amount of damage sustained by Hoffs was $3,996.45, an amount consistent with the only estimate admitted into evidence to restore her property. We further agree with Hoffs that the trial court abused its discretion in determining that Batman did not act recklessly in applying Roundup along the fence line, and that Hoffs is accordingly entitled to treble damages

pursuant to R.C. 901.51. Batman testified that he is familiar with Roundup, that he has used the product for 35-40 years, and that he is aware of the damage it can cause to vegetation. We agree with Hoffs that the record reflects that Batman was aware of concerns regarding his use of Roundup and over-spraying the product beyond his property. Hoffs testified that in 2007 she voiced concern about the safety of a white pine tree to Batman when she observed him spraying herbicide along the fence line, and that her pine tree subsequently died and had to be removed. Hoffs stated that she notified Batman in writing of her belief that he caused the death of her tree as a result of his spraying. A copy of the March 28, 2008 letter, along with a $1,176.90 cost sheet to remove and replace the white pine, and a photograph of the healthy tree in 2007 were admitted into evidence without objection.

{¶ 57} Further, the following exchange occurred in the deposition of John Mantei regarding an exchange between Batman and Mantei in May of 2012, the same time period at issue herein:

Q. * * * Let me ask you one more question, one or two more questions. Do you recall how the conversation between you and Fred Hoffs or Becky Hoffs started last May about this whole issue?

A. The four of us, my wife and the Hoffs, were out in the yard and the brown spot was obvious, but how it started, I don't know. I can't recall.

Q. Do you recall if - - did they ask you how the brown spot got there or do you recall how it was that you informed the Hoffs that Mr. Batman told you he had been spraying out in that area?

A. He did not tell me he had been spraying in the area. He told

me, you know, he had sprayed and caused that spot. That's all. And how it came up with the Hoffs, I can't remember.

Q. And I think what you're testifying to is you never saw Mr. Batman spray, you don't know where he was spraying or how long he'd been spraying? *He just told you that he was spraying where the brown spot on your property was, correct?*

A. *Yes.* [Emphasis added.]

**{¶ 58}** As noted above, Batman testified that he only sprayed the bottom of his fence. In his interrogatory response he indicated that he did not spray on Hoffs' property, and that he always used Exhibits B, G, and H, which were not admitted into evidence, to control the area sprayed. However, Liming introduced the photographs that he took of the damage, and the damage depicted is clearly on Hoffs' side of the fence. In his briefing, Batman asserts that he owns several inches of land beyond his fence, and Liming testified that the damage he observed was within two or three feet of the fence. Liming and Young testified that the damage is consistent with herbicide use, and Liming testified that he did not test the forsythia bush he sampled because Batman admitted using Roundup in the area in May. Liming further testified that the person applying Roundup determines where the product is applied. We agree with Hoffs that she does not have to prove that Batman specifically used Roundup in May of 2012, as opposed to another product. We find that Batman's suggestions that Buckeye EcoCare could have caused the damage defies credulity; the only damage is to a row of bushes adjacent to Batman's fence, and Liming and Young described the rest of Hoffs' landscaping as manicured and meticulous. Finally, Hoffs lost 13 large, mature shrubs, and we conclude that the extent of the damage

is evidence that Batman, with heedless indifference to the consequences, disregarded a substantial and unjustifiable risk known to him in applying Roundup.

{¶ 59} For the foregoing reasons, Hoffs' sole assigned error is sustained. Hoffs is entitled to treble damages. Batman's assigned errors are overruled, and the judgment of the trial court on Batman's objections to the Magistrate's decision is vacated. Judgment reversed and remanded for proceedings consistent with this opinion.

. . . . . . . . . . . .

HALL, P.J. and TUCKER, J., concur.


Copies mailed to:

Richard A. Boucher
Julia C. Kolber
Noel K. McKeown
Christ Theodor
Hon. Beth W. Cappelli